# EXHIBIT 1

Louis Niedelman, Esquire
(New Jersey 254601969)
COOPER LEVENSON, P.A.
1125 Atlantic Avenue - 3rd Floor
Atlantic City, NJ 08401
Telephone: (609) 344-3161
Facsimile: (609) 344-0939
File No. 60,389-9
Attorney for Plaintiff, BOARD OF TRUSTEES OF THE INTERNATIONAL ACADEMY OF
ATLANTIC CITY CHARTER SCHOOL

|  |  |
|---|---|
| BOARD OF TRUSTEES OF THE INTERNATIONAL ACADEMY OF ATLANTIC CITY CHARTER SCHOOL, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION ATLANTIC COUNTY |
| Plaintiff, | DOCKET NO. ATL-L-1531-18 |
| vs. | Civil Action |
| SPRINGFIELD EDUCATION MANAGEMENT, LLC; SABIS EDUCATIONAL SYSTEMS, INC.; CARL BISTANY; LYNN SPAMIMATO; JOSE ALFONSO; and ANNA DOSEN, jointly, severally and in the alternative, | **VERIFIED COMPLAINT FOR COMPENSATORY AND PUNTIVE DAMAGES AND AN ORDER TO SHOW CAUSE** |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff, the Board of Trustees of the International Academy of Atlantic City

Charter School, located at 6718 Black Horse Pike, Egg Harbor Township, New Jersey 08234,

operates an independent public charter school in accordance with the New Jersey Charter School

Program Act of 1995, N.J.S.A. 18A:36A-1 et seq., and the New Jersey Administrative Code

Charter School Regulations Act, N.J.A.C. 6A:11-1.1, and in accordance with all other applicable

federal and state law. The Plaintiff will be identified in this Complaint as the "SCHOOL".

2.      Defendants are in the business of educating children in accordance with the Educational Program and Philosophy of SABIS Educational Systems, Inc. ["SABIS"].

3.      The SCHOOL and SABIS entered into a contract known as "Education Service Provider Agreement" ["AGREEMENT"] dated January 29, 2015.   This AGREEMENT is attached to this pleading as **Exhibit A**.

4.      This AGREEMENT forms the basis of this lawsuit.

---

## ALLEGATIONS

### COUNT ONE – BREACH OF CONTRACT

5.      Pursuant to the terms of the AGREEMENT, SABIS agreed to supply certain products and services to the SCHOOL during the term of the AGREEMENT [the "TERM"].

6.      During this TERM, Defendants failed to comply with their contractual responsibilities, including, but not limited to:

      A. Failure to provide a full-time Certified Principal;

      B. Failure to engage in a good faith effort to renew the SCHOOL'S charter, absent a renewal of the entire AGREEMENT;

      C. Failure to manage the activities of the SCHOOL DIRECTOR as required by the AGREEMENT;

- 2 -

  D. Failure to perform the REAL ESTATE functions as required by the AGREEMENT;

  E. Failure to perform the INSURANCE requirements as demanded by the AGREEMENT;

  F. Failure to perform the ENROLLMENT function requirements as demanded by the AGREEMENT;

  G. Failure to perform the TEACHER AND STAFF requirements as demanded by the AGREEMENT;

  H. Failure to perform the REPORTING BY EDUCATIONAL PROVIDER requirements as demanded by the AGREEMENT; and

  I. Failure to provide timely and qualified personnel to ensure that the SCHOOL was equipped to properly educate its student body.

  7. Pursuant to the terms and conditions of the AGREEMENT, on May 11, 2018, the SCHOOL sent a timely notice to the Defendants advising of Plaintiff's intent to terminate the AGREEMENT and not to renew the AGREEMENT.

  8. The Plaintiff has complied with all terms and conditions of the AGREEMENT.

  9. As a result, Plaintiff has sustained ascertainable damages and losses.

  **WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

## COUNT TWO – ORDER TO SHOW CAUSE

10.     Paragraph 8.2.2 of the AGREEMENT compels the parties to the AGREEMENT to resolve any disputes through Binding Arbitration alone.  This requirement is illegal as stated in Paragraph 8.2.2 pursuant to applicable New Jersey law.  See Morgan vs. Sanford Brown Institute, 225 N. J. 289 (2016).

11.     Defendants, on June 18, 2018 filed for Arbitration with the American Arbitration Association.  See **Exhibit B** attached.

12.     This Verified Complaint seeks an Order to Show Cause why this Arbitration filing should not be stricken and dismissed with prejudice.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for dismissal with prejudice of the Arbitration filing by the Defendants, plus compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

## COUNT THREE - NEGLIGENCE

13.     All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

14.     Defendants at all times conducted themselves in a negligent, careless, reckless, grossly negligent, and intentional fashion in attempting to comply with the terms and conditions of the AGREEMENT.

15.     As a result, Plaintiff has sustained ascertainable damages and losses.

- 4 -

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

## COUNT FOUR

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

16.     All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

17.     Pursuant to N.J.S.A. 56:8-1 et seq., the New Jersey Consumer Fraud Act, Plaintiff qualifies as a "consumer" of goods and services purchased from the Defendants, who are also bound by this statute.

18.     Defendants engaged in unconscionable commercial practices, deception, fraud, false pretense, false promises, misrepresentations, and the knowing concealment, suppression and omission of material facts with an intent that Plaintiff rely upon such, all of which constituted unlawful practices within the ambit of N.J.S.A. 56:8-1 et seq.

19.     As a result, Plaintiff has sustained ascertainable damages and losses to plaintiff.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for treble compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

- 5 -

## COUNT FIVE - COMMON LAW FRAUD

20.     All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

21.     Specifically, Defendants engaged in common law fraud, including but not limited to, their fraudulent and willful defaults as described in Count One.  Plaintiff relied upon these false and fraudulent representations and conduct resulting in Plaintiff sustaining ascertainable damages and losses. All of Defendants' fraudulent conduct occurred between January 29, 2015 and June 20, 2018, including, but not limited to, the following:

> A. On or about June 23, 2016:  Defendants created a discriminatory work environment with gender discrimination against the SCHOOL by offering a salary  of $125,000 per year to a male, where a female had superior credentials and was earning a lesser salary than the male;
>
> B. On or about June 30, 2016:  Defendants failed to provide an annual report for the school year 2017-2018;
>
> C. On or about March 20, 2017 and other dates, the Plaintiff issued real estate expenditures that were recommended by the Defendants and were excessive and improper;
>
> D. On or about April 25, 2017 Defendants failed to support and timely respond to an urgent need for space expansion;

- 6 -

E. On or about October 2, 2017 Plaintiff learned that the Defendants had failed to secure proper and adequate insurance coverage to respond to a physical damage claim by the owner lessor of their prior school premises located in Pleasantville, New Jersey;

F. On or about October 23, 2017 Defendants failed to provide an Academic Officer and demanded that the school not hire a qualified candidate but instead allowed the position to be vacant, all to the detriment of the Plaintiff and the students of the school;

G. On or about February 8, 2018 it was discovered that Defendants allowed 14 people, no longer associated with the school, to remain on the insurance roster and allowed and authorized the SCHOOL to pay $62,000.00 for them and this payment was unnecessary and was evidence of the negligence of Defendants;

H. On or about April 16, 2018 Defendants failed to provide a qualified School Director pursuant to a motion of the Board of Trustees; and

I. For the years 2015, 2016, 2017 and 2018 Defendants failed to provide quarterly budget reviews so that the Plaintiff could estimate actual expenses versus future expenses.

22. Defendants have engaged in common law fraud all to the financial detriment of Plaintiff.

23. As a result, Plaintiff has sustained ascertainable damages and losses.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

## COUNT SIX

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

24. All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

25. Defendants have negligently and intentionally violated their covenant of good faith and fair dealing owed to the Plaintiff by their mismanagement of the SCHOOL and their multiple breaches of the terms and conditions of the AGREEMENT entered into with the Plaintiff.

26. On  June 11, 2018, Defendants intentionally and deliberately filed an Ethics Complaint with the School Ethics Commission of the New Jersey Department of Education against Peter Caporilli [President of the Plaintiff Board] in an effort to stymie, sabotage and otherwise interfere with the normal operation of the SCHOOL.  See **Exhibit C** attached.

27. As a result, Plaintiff has sustained ascertainable damages and losses.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

- 8 -

<u>COUNT SEVEN</u>

## <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE</u>

28.   All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

29.   As a result of Defendants' conduct as described above in all Counts, Defendants have tortiously interfered with Plaintiff's economic advantage in the management and operation of the SCHOOL, all to the detriment of the Plaintiff.

30.   At the Board of Trustees meeting of the SCHOOL conducted on June 20, 2018, representatives of Defendants, in public session, stated in writing and verbally that "Dr. Caporilli is not fit to remain on the Board and we ask that he resign or be removed immediately . . . . in addition, the other Board members should seriously consider whether their continuance on the Board serves the best interests of the School."

31.   As a result, Plaintiff has sustained ascertainable damages and losses.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

### <u>COUNT EIGHT</u>

### <u>UNJUST ENRICHMENT</u>

32.   All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

33.     Plaintiff did not receive the value of the goods and services for which they contracted pursuant to the AGREEMENT which goods and services Defendants promised to deliver contractually.

34.     Plaintiff has paid in full for all the contracted goods and services and therefore Defendants have been unjustly enriched.

35.     As a result, Plaintiff has sustained ascertainable damages and losses.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

## COUNT NINE

## BREACH OF FIDUCIARY DUTIES

36.     All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

37.     At all times, Defendants owed fiduciary duties to the Plaintiff to fulfill their contractual responsibilities in a timely and competent manner for the benefit of the Plaintiff. Defendants breached these fiduciary duties resulting in damages and losses to the plaintiff.

38.     As a result, Plaintiff has sustained ascertainable damages and losses.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly, severally and in the alternative, for compensatory and punitive damages, and recovery of attorney's fees, legal costs and expenses.

- 10 -

## COUNT TEN

## CLAIM FOR REIMBURSEMENT OF FEES AND EXPENSES PAID TO DEFENDANTS

39.     All paragraphs of the preceding Counts are repeated and incorporated into this Count by reference.

40.     As a result of Defendants' conduct identified in this Verified Complaint and the claims asserted in all Counts set forth above, Plaintiff seeks reimbursement of all fees and expenses paid to Defendants from the inception of the AGREEMENT on January 29, 2015 to date.

41.     As a result, Plaintiff has sustained ascertainable damages and losses.

**WHEREFORE**, Plaintiff demands reimbursement damages against Defendants, jointly, severally and in the alternative, including recovery of attorney's fees, legal costs and expenses.

## JURY DEMAND

Trial by jury is hereby demanded as to all issues set forth herein.

## NOTICE PURSUANT TO RULES 1:5-1(a) AND 4:17-4(c)

TAKE NOTICE that the undersigned attorneys, counsel for Plaintiff, do hereby demand, pursuant to Rules 1:5-1(a) and 4:17-4(c) that each party herein serving pleadings and interrogatories and receiving answers thereto, serve copies of all such pleadings and answered interrogatories received from any all parties, including any documents, papers and other materials referred to therein, upon the undersigned attorneys, and TAKE NOTICE that this is a continuing demand.

- 11 -

## NOTICE OF TRIAL COUNSEL

PLEASE BE NOTIFIED that pursuant to Rule 4:25-4, Louis Niedelman, Esquire, is hereby designated as trial counsel in the above-captioned litigation on behalf of the firm of Cooper Levenson, P.A.

## CERTIFICATION PURSAUNT TO 4:5-1

Pursuant to the provisions of 4:5-1, the undersigned attorney certifies that this matter is the subject matter of another action pending in this Court. That matter is entitled: SABIS Educational Systems, Inc./Springfield Education Management, LLC ("SABIS") (Plaintiff) vs. International Academy of Atlantic City Charter School and Board of Trustees of the International Academy of Atlantic City Charter School (Defendants); Superior Court of New Jersey, Law Division—Atlantic County, Docket No. ATL-L-1416-18.

## DEMAND FOR PRESERVATION OF ALL DOCUMENTS AND RECORDS

Demand is hereby made upon the Defendants for them to preserve and protect all documents and records in their possession, including but not limited to: paper records and documents, all electronic documents and records that are situated upon any computer servers that are owned or managed or operated or leased to and by any of the Defendants; and any other documents and records relating in any fashion or manner to the relationship between the Defendants and the Plaintiff pursuant to the AGREEMENT that is identified in the body of this Verified Complaint.

Any breach and/or violation of this demand will result in claims of spoliation of evidence for which Plaintiff will seek compensatory and punitive damages and Court sanctions against all Defendants.

## VERIFICATION

I, Peter Caporilli, as President of the Board of Trustees of the Plaintiff, have read the Verified Complaint and certify that the allegations contained in the Verified Complaint are true to the best of my knowledge and belief. I certify that the foregoing statements made by me are true and I am aware that if any are willfully false, I am subject to punishment.

INTERNATIONAL ACADEMY OF
ATLANTIC CITY CHARTER SCHOOL

By: _____

PETER CAPORILLI, President
Board of Trustees

Dated: June 22, 2018

COOPER LEVENSON, P.A.

By: _____

Louis Niedelman, Esquire
Attorneys for Plaintiff, BOARD OF
TRUSTEES OF THE INTERNATIONAL
ACADEMY OF ATLANTIC CITY
CHARTER SCHOOL

Dated: June 22, 2018

CLAC 4536855.1

- 13 -

# EXHIBIT A

**Education Service Provider Agreement**

This Education Service Provider Agreement executed on this 3rd day of December, 2014, (the "Agreement") by and between The Board of Trustees of the International Academy of Atlantic City Charter School (the "Board") with offices at 29 South New York Road, Suite 1200, Galloway, NJ 08205 and Springfield Education Management LLC, a Delaware Limited Liability Company with an office at 6385 Beach Road, Eden Prairie, Minnesota 55344 (hereinafter "Education Provider").

## PREAMBLE

**WHEREAS,** the Board has entered into or expects to enter into a Charter School Contract, which shall include the Charter Application or Petition with the New Jersey Department of Education, to be issued effective July 1st, 2015, to operate an independent Public Charter School in accordance with the New Jersey Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 et seq. and New Jersey Administrative Code charter school regulations, N.J.A.C. 6A:11-1.1 et seq. (hereinafter "Charter School Law") and in accordance with all other applicable federal and state laws;

**WHEREAS,** the Education Provider is in the business of educating children in accordance with the Educational Program and philosophy of SABIS® Educational Systems, Inc., ("SABIS") and is desirous of working with the Board to implement the SABIS® Education Program and Philosophy at the School;

**WHEREAS,** the Board desires to have the Education Provider provide educational and other services to and on behalf of the School, in accordance with the provisions of Charter School Law, and any and all other applicable laws and regulations and upon the terms and conditions hereinafter set forth and the Education Provider desires to provide such services to the Board; and

**WHEREAS,** the Board and Education Provider share a common vision that diligent use of the SABIS® Educational System will help a randomly selected, diverse group of students become responsible citizens with a love of life-long learning;

## WITNESSETH

**NOW, THEREFORE,** in consideration of the mutual covenants, representations, warranties and agreements contained herein and for other good and lawful consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1. **Rights and Obligations of the Board.**

    1.1. **Governance.** The Board shall be responsible for the oversight, but not the day-to-day management, of the School. The Board's oversight responsibilities shall be limited to that which is required by law or necessary to ensure the Education Provider's

1 of 22

compliance with the terms of this Agreement. The Board shall comply with all of the provisions of applicable law including, but not limited to, those regulating access to equal educational opportunities, open meeting laws, New Jersey School Ethics Act, the Board's own by-laws, and freedom of information laws. In order to allow for the Education Provider to attend Board meetings virtually, the Board agrees to make available the use of video conferencing technology at all its Board meetings.

The Board shall carry out its duties under this Agreement in such a manner as to minimize disruption to the orderly functioning and administration of the School, and the Education Provider shall have the authority in its good faith judgment to ensure such minimized disruption. Unless otherwise agreed to in advance by the Board and the Education Provider, or in the case of an emergency, Board members shall not access the School during academic hours. This limitation shall not apply to a Board member whose child is a student at the school. In such a case, the particular Board member shall have the same right of access as other parents of students of the School. The Board recognizes that frequent disruption of the educational process can be detrimental to the progress of the students and an impediment to the mutual goals of the Board and the Education Provider. Unreasonable interference by the Board of the day-to-day management of the School will be considered a material breach of this Agreement and subject to the provisions of Section 8.2.1.

**1.2.    Appointment.** The Board represents that it is authorized by law to contract with a private entity for that entity to provide educational management services. The Board hereby appoints and engages the Education Provider for the purpose of providing managerial, administrative and educational services to the School more specifically described herein.

**1.3.    Maintenance of Charter.** The Board has the obligation to comply with the provisions of and to maintain the Charter Contract, granted by the New Jersey Department of Education (the "Authorizer"), including the Charter Petition or Application (the Charter Contract and Charter School Petition or Application shall hereinafter be referred to as the "Charter") for establishment of an independent Public Charter School ("the School") in accordance with all New Jersey charter school laws and regulations and in accordance with all other applicable federal and state laws.

**1.4    Communication with Education Provider.**

**Third-Party Complaints.** If the Board receives a complaint regarding any alleged material deficiency in any aspect of the Board's or the Education Provider's operations from any person or entity, or if the Board is notified by the Authorizer or any other governmental authority that the Board or the Education Provider is or may be in material violation of Charter School Law or any other applicable law or regulation (all of the foregoing collectively referred to as "Potential Violations"), then the Board shall immediately notify the Education Provider contact listed at the end of this Agreement of the Potential Violations and provide a reasonable timeframe for the Education Provider to

investigate and report back to the Board. Conversely, if the Education Provider is first notified of Potential Violations by any person or entity, it shall promptly notify the Board of such Potential Violations. Upon receiving notice from any source of a Potential Violation, the Education Provider shall conduct a thorough investigation to determine whether or not the claimed violation in fact exists. The Board shall reasonably cooperate with the Education Provider in the Education Provider's investigation of such Potential Violation.

If the Board makes a good faith determination that the Education Provider is failing to do all things necessary and reasonable to investigate, remedy, rebut or contest the alleged Potential Violation, then the Board shall provide written notice to the Education Provider of such belief, stating with particularity the reason for its finding and the Parties shall meet and attempt to resolve the dispute. If the dispute is not resolved, the Board may, but shall not be obligated to, separately take all reasonable actions to investigate, remedy, rebut or contest the alleged Potential Violation, including but not limited to establishing direct communications with the person(s) raising the Potential Violation or retaining counsel to contest the matter or negotiate a solution. The foregoing notwithstanding, (a) the Board shall not consent to the entry of any judgment or enter into any settlement with respect to a Potential Violation without prior written notice to the Education Provider, and (b) the Board shall seek the Education Provider's reasonable cooperation in the defense of the matter.

1.5.    Evaluation of Education Provider. Education Provider shall cooperate fully with the Board in the Board's review of the progress of Education Provider towards educating the children in accordance with the Charter. Any third-party evaluation must be performed by a mutually agreed upon evaluator. Any evaluation of the Education Provider must not disrupt the educational process. The first evaluation under this Agreement shall not commence prior to the completion of one full academic year. Thereafter, evaluations shall be conducted per a mutually agreed upon schedule.

1.6.    Student Enrollment. Education Provider and the Board shall work cooperatively in recruiting and admitting students to the School, subject to the Charter School Law, School Policies, and any and all other applicable federal and state laws and regulations. Students shall be admitted to the School as determined pursuant to policies established by the Board in close cooperation and with the consent of Education Provider. Education Provider shall be responsible for administering the School's recruitment, admissions, lottery and enrollment processes in accordance with the policies established by the Board, Charter School Law, and any and all other applicable federal and state laws and regulations.

1.7.    Legal Status. The School is a public charter school established by a charter issued by the New Jersey Department of Education and any extensions. The Board is organized as a non-profit organization.

3 of 22

1.8.  **Physical Space.**  The Board shall be responsible for finding and acquiring occupancy rights in the physical spaces where the School will operate, and for ensuring the physical spaces will be ready for occupancy at least three weeks prior to the first day of school.  All costs incurred in locating facilities, including but not limited to surveying, engineering, renovation, consultant costs, and initial lease payments, shall be paid from funds allocated in the Start-Up Budget, and additional lease payments shall be part of the Operating Budget.  The Board shall delegate to the Education Provider the management of such real estate.  The Education Provider must approve in writing all decisions related to the acquisition, remodeling and maintenance of the facilities.  The Education Provider shall be responsible for determining who has access to the building, including who has keys to the building, regardless of who signs the lease or owns the property.

1.9.  **Name of the School.**  The name of the School shall be "International Academy of Atlantic City Charter School."  During the term of this Agreement, all business cards, letterhead, brochures, signs, press releases, official school correspondence, websites, including social media sites, etc., shall also contain the following words: "Member of the SABIS® School Network" pursuant to the corporate guidelines and the SABIS® Logo – the olive tree with the date 1886.  If Education Provider or another SABIS® affiliate no longer manages the School, the Board shall not be permitted to use any copyrighted or protected name or logo associated with SABIS® and shall immediately remove and return all items containing the SABIS® name and or logo.  Should the Board fail to remove and return all items containing the SABIS® name and or logo within seventy-two (72) hours of the Education Provider or other SABIS® affiliate ceasing to manage the School, the Board shall pay liquidated damages of One Thousand ($1,000.00) Dollars per day to the Education Provider.  The parties acknowledge and agree that the failure of the Board to remove and/or return all items containing the SABIS® and and/or logo within the seventy-two hours provided herein shall constitute an adequate basis for a request for, and a grant of, injunctive relief from a court of competent jurisdiction.

1.10.  **Publicity.**  The Board shall not refer to the Education Provider or any entity affiliated with the Education Provider in any advertising or other publication in connection with goods or services rendered by the Education Provider without the prior written approval of the Education Provider.

1.11.  **Governing Board Training.**  Prior to the opening of the school, as well as on a yearly basis afterwards, all Board members shall participate in formal School Governing Board training pursuant to NJSA 18A:12-33.  The cost of such training shall be a budget item.

2.  **Rights and Obligations of Education Provider.**

Consistent with the obligations of the Board under the Charter School Law, School Policies and any and all applicable federal and state laws and regulations, Education Provider shall have the following rights and obligations in connection with the operations of the School and education of the children enrolled as students in the School.

2.1.    Authority and Obligation to Manage School.

2.1.1.    Subject to the provisions of this Agreement, Education Provider shall be responsible for the operation of the School, and Education Provider shall have the right and obligation to educate the children enrolled in the School.  These duties shall include:

(a)    Implementation of the education program and program of instruction (specifically, the SABIS® curriculum, SABIS® books and SABIS® Educational System identified in the Charter application), inclusive of all special education program requirements, consistent with NJ core curriculum standards.

(b)    Development and administration of the school's curriculum and determination of the applicable grade levels and subjects.

(c)    Selection, hiring and performance review of all personnel, including the School Director, and payroll functions on behalf of the Board, subject to the approval of the Board, such approval not to be unreasonably withheld.

(d)    Professional development for directors, instructional personnel, and other administrative staff.

(e)    Maintenance and operation of the School facilities.

(f)    Management and administration of the School, its staff, facilities and programs.

(g)    All extra-curricular programming, including but not limited to before and after school care and programs, implemented in connection with the School.

2.1.2.    Subject to the approval of the Board, the Education Provider shall be responsible for procuring the services set forth in this Section 2.1.2 and may, and in conformance with Charter School Law, subcontract with public or private entities or with private persons, in the name of the Board and as set forth in the Budget, in furtherance of the objectives of this Agreement for:

•    Food and transportation;

•    Custodial services, supplies and equipment;

•    Special education services;

•    Construction of new buildings and/or improvements to existing building sites as Education Provider deems necessary for the implementation of its program, subject to the availability of adequate financing; and

* Any other services as consented to by the Board that Education Provider deems reasonable and necessary to achieve the goals of the Board and Education Provider, including but not limited to nursing, after-school programs, security, drafting requests for proposals, and drafting grant applications.

**2.2.    Student Outcomes.** Education Provider shall provide to the Board the reports set forth in 2.3. for the Board's review and approval, and shall set student standards for performance which shall meet or exceed the minimum standards established by the Charter School Law, School Policies, and any and all other applicable federal and state laws and regulations. It shall be the responsibility of Education Provider that the students shall meet annually agreed upon standards for performance which shall provide for:

* Full compliance with the Charter School Law, the methods and philosophy as set forth in the Charter, School Policies, and any other applicable law or regulation.

* Student testing in the first month of school using a nationally recognized norm-reference test to establish a benchmark. Students will be tested again in spring, using another form of the same test, to determine their improvement during the year. A one month gain for each month of school between the fall and spring administration of the test is expected.

* Student proficiency in essential concepts per subject. Through frequent testing, as needed, as well as final exams at the end of each term, students will display proficient understanding of essential subject material as defined by the Education Provider curriculum.

**2.3.    Reporting by Education Provider.**

**2.3.1.** Education Provider shall submit an annual report to the Board before the beginning of the following academic year, reporting its progress towards attaining student outcomes. The report shall contain information regarding student achievement by grade level on a norm-reference test. Education Provider may, at its sole discretion, submit its annual report through the Director and/or the Academic Quality Control officer.

**2.3.2.** Education Provider shall provide to the Board on a quarterly basis a budget analysis showing budget versus actual comparisons in the same format as the budget. Education Provider may, at its sole discretion, submit its budget analysis through the Director and/or the Business Manager. In consultation with the Education Provider, the Board shall engage an independent audit firm to complete the annual audit and Education Provider shall comply with all reasonable requests. The cost of the audit shall be a budget item.

**2.3.3.** Education Provider shall provide full opportunity for the Board to observe the Education Provider educational processes, review curriculum, review appropriate

data, and meet and confer with designated Education Provider contacts, provided arrangements are made in advance with the Education Provider and provided the educational process is not disrupted. Any contact between Board Members and School staff must be made through the Education Provider.

    **2.3.4.** Education Provider shall report regularly through reports submitted by the School Director at Board meetings or at other times, as necessary. The Education Provider will delegate the representative to attend Board meetings.

  **2.4.** **Fees.** Fees may only be charged to students in accordance with applicable provisions of the Charter School Law, School Policies, and any other applicable federal or state laws or regulations. No fees may be charged or assessed to students by the Board without the prior written approval of the Education Provider.

  **2.5.** **Insurance.** The Education Service Provider undertakes to maintain insurance as listed in Appendix A to protect the interest of the School and other interested parties. Such insurance shall be taken out by the Education Service Provider at the cost and expense of the School.

  **2.6.** **Charter between the Board and Authorizer.** Neither party will act, or fail to act, in a manner that will cause the Board to be in breach of its Charter with the Authorizer.

**3.** **Budget, Funding, and Compensation to Education Provider.**

  **3.1.** **Budget.** All revenues will serve to fund the operation of the School. Education Provider, no later than May 31 of each year, or earlier if required by law, shall prepare and present to the Board a detailed recommended operating budget and capital outlay budget for the next fiscal year (the "Proposed Budget"). The Proposed Budget shall show each area of expenditure as a separate line item, including funds allocated for use by the Board for legal fees, charter renewal fees, and incidental Board administrative expenses ("Board Expenses"), and fees and payments to Education Provider. Funds allocated for Board Expenses shall not exceed $25 per student. The Board shall review the Proposed Budget with Education Provider and shall provide Education Provider with the Board's comments, in writing, within ten (10) days of receipt of the proposed budget. If the Board and Education Provider are not able to agree on a Budget before the expiration of the current fiscal year, the last approved Budget, adjusted only to reflect enrollment changes, shall remain in effect until a Budget has been agreed upon or finalized through the dispute resolution process set forth herein.

If the parties have not reached agreement on the Budget within thirty (30) days of the submission of the Proposed Budget by Education Provider to the Board, either party may request that open issues are referred to the Executive Atlantic County Superintendent or the Department of Education on the following issues:

    (1)    the effect on educational outcomes for the students;

(2)     the funding provided for in previous budgets and the amounts actually expended; and

(3)     the projected levels of revenue and expense for the year in issue.

**3.1.1.**   Net Deficit. Education Provider is not obligated to cover any Net Deficit (as per the audited financial statements) of the School. The Net Deficit, in its entirety, shall be the responsibility of the Board and the Board shall indemnify and hold the Education Provider harmless for any Net Deficit, including all costs and attorneys' fees.

**3.1.2.**   Start-Up Costs. The Education Provider will submit to the Board a budget for the anticipated start-up costs including a contingency of 15% in order to take into account any extraordinary additional expenses. The Education Provider will obtain the consent of the Board in advance for unbudgeted expenses exceeding 5% of the total start-up budget.

**3.1.3.**   Gaps in State Funding.  In the event that there is a gap between Tuition Funding from the State and expenses incurred by the School due to the Tuition Funding cycle set by the State (i.e. Tuition Funding is not received on the first day of each month or the first day of each quarter), the Board is responsible for covering the gap either using the budget reserve or with a line of credit.  The line of credit shall be with a third party or, if third party funding is not available, may be with the Education Provider at the Education Provider's sole discretion.  Any line of credit provided by Education Provider will require a separate agreement between the Board and Education Provider, and interest will be charged.  Such line of credit is designed to be a short-term solution and the Board shall be required to build a reserve, or acquire a third-party line of credit, sufficient to finance funding gaps, and such reserve shall be used first to finance any funding gaps.

**3.2     Funding.** All funds received in connection with the School shall be deposited in the School's bank account.  Expenditures from the School's bank account shall be made only in accordance with the Budget (as it may be modified by agreement from time to time) and upon approval in writing by the Director of the School or the Business Manager to whom the Director may delegate this responsibility.  The School Director and one other School employee, as determined by Education Provider, shall have authority to sign checks written on the School's bank account.  A representative of Education Provider shall be appointed by Education Provider to be a back-up check signatory.

Subject to applicable laws and regulations, either party may apply for and receive funding from private sources to be used for the benefit of the School.  The Parties shall cooperate in good faith in applying for applicable funding; provided, however, that the Education Provider shall have final authority to approve or reject outside funding. Education Provider further agrees that any grants received from any federal or state agency or non-profit corporation shall be used as directed by the grantor of the grant and any unexpended funds from those sources shall not be deemed as unexpended funds, and shall not be part of the base upon which Education Provider's fees are calculated, nor in any calculation of the Year End Operating Balance. If Education Provider obtains grant funds for the School and such grant funds contain a component for

8 of 22

administration, Education Provider shall be entitled to that component if allowed under the terms of the grant and by law.

The Parties acknowledge that all funds allocated for the operational support of the School shall be spent in accordance with the Board-approved Operating Budget. Significant line item deviations at the object level greater than fifteen percent (15%) of any major line item, major line items being those whose budget exceeds fifteen percent (15%) of Total Revenues, from the approved Operating Budget must be approved by the Board prior to disbursement. Education Provider shall provide the Board with all relevant information with respect to such deviation and the Parties shall engage in good faith negotiations to resolve such extra-budgetary requests. If the parties cannot reach an agreement, the issue shall be resolved pursuant to the procedures contained in Paragraph 8.2.2 of this Agreement.

**3.3. Compensation to Education Provider.**

    3.3.1    License Fees of eight percent (8%) of total per pupil funding (as set forth in N.J.S.A. § 18A:36A-12) for the use of SABIS® pedagogical materials (including but not limited to curriculum, pacing charts, AMS exams of Math & English, Periodic exams of Math, English, Science, Spanish, Social studies, and SABIS® School Management System) provided by the Education Provider during the term of this Agreement or renewal term of this Agreement (the "License Fee"); and

    3.3.2    Management Fees of six percent (6%) of total per pupil funding (as set forth in N.J.S.A. § 18A:36A-12) for services provided, including but not limited to methodologies, teaching techniques, operating policies & procedures, on-going advice, academic strategies to enhance standards, staff distributions & timetabling, and academic oversight (the "Management Fee").

    3.3.3    Upon renewal of the Agreement, Education Provider reserves the right to adjust the License Fee and Management Fee subject to the approval of the Board.

    3.3.4    Support Services. Those services requested by the Board from independent contractors may be performed by Education Provider or Education Provider's parent company, SABIS® Educational Systems, Inc., provided that such services are included in the Approved Operating Budget, and further provided that Education Provider's cost to provide the services are less than the cost of an independent contractor. These services may include but are not limited to grant writing, website development, IT training, recruitment, facilities search, and drafting of RFPs which fall outside of the Agreement. Such services will be billed at Education Provider's then-current rate and are in addition to the Management Fee and License Fee.

9 of 22

3.3.5    All License and Management Fees and support services fees, if any, shall be paid within *three (3)* days of receipt by the Board of any funds paid by the State to the Board. The balance of all Fees shall be paid within thirty (30) days of the final installment payment.

3.3.6.   Education Provider shall be entitled to reimbursement for expenses related to the performance of this Agreement, *which are not part of the operating budget*, only with the advance written approval of the Board, based upon findings that: (a) the expense was necessary; and (b) the expense is one that should not be borne by Education Provider because it is beyond the scope of the management services for which Education Provider is being compensated by the Management Fee.

## 4.    Term and Termination.

**4.1.    Term.** This Agreement shall commence on the date this Agreement is signed and end on June 30th, 2019, and subject to renewal of the Charter and the provisions of the Charter School Law and any other applicable federal and state laws and regulations.

**4.1.1.    Option to Renew.** This Agreement will automatically renew for an additional 5 year term, subject to section 3.3.3. of this Agreement, unless either party gives notice of termination at least twelve (12) months prior to the expiration of the Term. If either party gives such notice but wishes to renegotiate the Agreement, then the parties will have a period of 6 months to renegotiate. During this period of time the Education Provider will continue managing the School under the terms of this Agreement except that any function or action related to preparing the School for the year following the end of this term will be placed on hold unless and until a new Agreement is executed. In the event that the parties wish to renegotiate the Agreement, a new Management Agreement must be signed before Education Provider will assist in the preparation of a charter renewal application.

**4.2.    Termination.**

**4.2.1.    Termination for Cause.** Either party may terminate this Agreement in the event of a material breach pursuant to the provisions of 8.2.1.

**4.2.2.    Due To Adverse Law.** If any federal, state, or local law or regulation or court decision has a materially adverse impact on the ability of either party to carry out its obligations under this Agreement, and the Parties agree as to the material adverse impact, then either party, upon written notice to the other party, may request good faith renegotiation of the Agreement; and if the Parties are unable to reach agreement on such terms, after good faith negotiations, prior to the end of the academic year, then either party may terminate the Agreement as of June 30 unless sooner termination is required by law.

**4.2.3.** Due to Charter Termination. In the event that the Charter is revoked or not renewed, then this Agreement shall automatically terminate as of the date of the effective date of said revocation or effective date of non-renewal.

**4.2.4.** Due to Adverse Conditions. If any Adverse Condition including, but not limited to, a decrease in state funding, or if a condition of the Charter makes it impossible, in the sole judgment of the Education Provider, for the Education Provider to continue managing the School, the Education Provider may terminate this Agreement upon written notice to the Board.

**4.2.5.** Due to Dissolution of the Board. In the event that the Board is dissolved, Education Provider may, in its sole discretion, terminate this Agreement.

**4.2.6.** Neither party shall be liable if the performance of this Agreement, in whole or in part, is prevented, delayed, hindered or otherwise made impracticable or impossible by reason of any strike, flood, riot, fire, explosion, war, act of God, sabotage, accident or any other casualty or cause not the party's fault, and which cannot be overcome by reasonable diligence and without unusual expense.

**4.2.7.** The Board acknowledges that this Agreement and all other agreements entered into between Education Provider, or any of its affiliates, subsidiaries, successors and/or assigns are deemed to be mutually dependent upon each other and a breach of any one agreement by the Board, may at the option of Education Provider, or any of its affiliates, subsidiaries, successors and/or assigns, be deemed a breach of any and all other agreements between the parties.

**4.2.8.** No Disparagement. In the event of any termination of this Agreement, the Parties agree that neither party, nor any of its members, affiliates, and/or associates will, directly or indirectly, in any capacity or manner, make, express, transmit, speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory or critical of, or negative toward, the other or any it's respective directors, officers, affiliates, subsidiaries, employees, agents or representatives.

Notwithstanding the foregoing, nothing in Section 4.2.8 or elsewhere in this Agreement shall prohibit either party from making any statement or disclosure required by local, state or federal law or ordinance.

**5.** **Employees.**

**5.1.** **Teachers and Staff.** The Board shall be the employer of all personnel but shall delegate all personnel functions to the Education Provider, subject to the approval of the Board and such

approval not to be unreasonably withheld. The Education Provider shall provide the following personnel functions: 1) selecting, hiring, training, managing, reviewing and terminating all staff associated with the School, including without limitation its teachers and all administrative and support staff, establishing personnel policies and procedures, and determining teacher and staff compensation; 2) determining the number of teachers and the number of support staff required for the operation of the School pursuant to the Charter; and 3) selecting and hiring such teachers, qualified in the grade levels and subjects required, and support staff as are needed to carry out the SABIS® Educational System of the School. Any employment decision that impacts the tenure of any staff member shall require approval of the Board, such approval not to be unreasonably withheld.

All classroom teachers and professional support staff shall hold appropriate New Jersey certification pursuant to N.J.S.A. 18A:36A-14. Such teachers and support staff may, at the discretion of the Education Provider, work at the School on a full or part time basis. Each teacher hired or retained by the Education Provider shall hold a valid teaching certificate issued by the state board of education, if required by law, and all teachers and staff shall have undergone a criminal background check and an unprofessional conduct check, as required by Charter School Law and other applicable state and federal laws.

**5.2    School Director.** The Board shall be the employer of the School Director but shall delegate all personnel functions relating to the employment of the School Director to the Education Provider including selecting, hiring, training, managing, reviewing, determining compensation and terminating the School Director. The Education Provider will have the authority and responsibility of holding the School Director accountable for the success of the School. The School Director shall report to the Education Provider and not to the Board. Any employment decision that impacts the tenure of the School Director shall require approval of the Board, such approval not to be unreasonably withheld.

**5.3.    Training.** The Education Provider shall provide training in its methods, curriculum, and the SABIS® Educational System to all personnel on a regular and continuous basis, or as deemed necessary by the Education Provider. All personnel shall receive such training as the Education Provider determines as reasonable and necessary under the circumstances, or as required by Charter School Law. Training shall occur on-site or at locations to be designated by Education Provider, at Education Provider's discretion. Expenses for training and seminars, including travel and lodging, related to the School shall be a budget item.

**6.    Proprietary Information.**

**6.1.    Education Provider's Prior Rights.** The Board agrees that Education Provider has the licensing right for (a) all trademarks, copyrights and other proprietary rights developed prior to the effective date of this Agreement, and hereinafter subsisting or created in its instructional materials, training materials, methods and other materials developed by Education Provider, its affiliates (including but not limited to SABIS® Educational Systems, Inc.) their employees, agents or subcontractors (to the extent such individuals are legally or contractually obligated to assign or have assigned such rights to Education Provider or to SABIS®

12 of 22

Educational Systems, Inc.); and (b) such other similar instructional materials, training materials, methods and other materials that may be developed at Education Provider sites or sites of Education Provider affiliated entities, which is protected by law ("SABIS® Proprietary Information"). During the term of this Agreement, Education Provider may identify and disclose to the School SABIS Proprietary Information including that which is currently in existence as well as that which may be created in the future.

6.2.    License to Board. Execution of this Agreement shall give rise to a revocable, limited, non-exclusive, non-transferable license, for the use of SABIS Proprietary Information to the Board for the purpose of operating the School's SABIS® Educational System, and Education Provider shall be paid a fee therefore as provided in Section 3.3.1. The Board shall be separately charged for books and consumable materials provided by the Education Provider to the School, even if such books and consumable materials contain SABIS® Proprietary Information. Except to the extent necessary for implementation of this Agreement, the Board shall not disclose, publish, copy, transmit, or utilize SABIS® Proprietary Information during the term of this Agreement or at any time after its expiration without the prior written approval of Education Provider.

6.3.    Jointly Developed Proprietary Information ("Derivative Works"). Derivative Works may only be created with written permission of Education Provider, including any and all curriculum or other educational materials which the Board may wish to develop using part or all of SABIS® Proprietary Information. Any such Derivative Works shall be considered SABIS® proprietary information and treated in accordance with Paragraph 6.1 of this Agreement. Education Provider will not claim as proprietary any curriculum or other educational materials developed and paid for by the Board, provided that such materials are developed wholly independently and without the use, directly or indirectly, of any SABIS® Proprietary Information.

6.4.    Education Provider Warranty and Indemnification. Education Provider warrants that it has all necessary rights to license the SABIS® Proprietary Information to the Board. Education Provider shall defend at its own cost any claim or action against the Board or the School for infringement of any patent, copyright, trade secret or other proprietary interest of any third party based upon any materials furnished or licensed hereunder or upon the Board's or the School's use of such furnished or licensed materials. Education Provider further agrees to indemnify and hold the Board and the School harmless from any and all liabilities, losses, damages, costs and expenses associated with any such claim incurred by the Board or the School including reasonable attorney's fees. If any SABIS Proprietary Information and/or other materials furnished hereunder is/are involved in such claim or action are held to constitute infringement and the use thereof is enjoined, Education Provider shall at its own expense: (1) procure for the Board and the School the right to continue using such materials; (2) modify the materials to become non-infringing but functionally equivalent; (3) replace such materials with equally suitable and functionally equivalent non-infringing materials; or (4) grant the Board an appropriate refund.

7.     **Property Ownership.**

7.1.     With respect to property acquisitions, the Education Provider has an obligation to act in the best interest of the School. All property purchased through the operating Budget with funds the Board may receive pursuant to Charter School Law, other than funds which accrue to Education Provider (including, but not limited to, the fees referenced in Paragraph 3, any reimbursed Education Provider expenses, lease payments, and any funds advanced under a Line of Credit, if applicable), as well as funds the Board may acquire through government or private grants or donations, shall remain the property of the Board.

7.2.     All contracts, whether with public or private entities, shall be entered into whenever possible in the name of the Board or School, as appropriate. Education Provider shall not be required to directly enter into any contract. Further, Education Provider shall not be required to guarantee any contract entered into on behalf of or by the School or the Board. Any contract or lease which Education Provider enters into for the use of property, whether real or personal, for the School shall include, if possible, a provision that the contract may be assigned to the Board. Upon termination of this Agreement, and in the event of subsequent dissolution of Education Provider, all property which Education Provider might lease, borrow or contract for use, shall be promptly returned to those organizations or individuals from which Education Provider has leased, borrowed, or contracted for the materials unless the Board votes to assume said contract or lease, and then Education Provider shall assign said contract(s) or lease(s) to the Board, if possible. All contracts shall, when possible, also include a provision terminating the contract upon termination of this Agreement at the option of either the Board or Education Provider, but in no event shall the contract exceed the term of the charter, unless prior approval is received from the Board, however, either party may elect to continue and assume the obligations of the contract.

7.3.     All acquisitions that, due to the Board's inability to purchase or finance, are purchased by the Education Provider with non-School funds including, but not limited to, instructional materials, equipment, supplies, furniture, computers and other technology, shall be owned by and remain the property of the Education Provider. Any property purchased with funds advanced to the Board by the Education Provider under a Line of Credit note shall be considered collateral until the note is repaid. The Board shall execute any documents required by the Education Provider to secure the collateral, including but not limited to any security instruments including but not limited to a note, security agreement and UCC statement.

7.4.     Upon termination for any reason, all property which has been purchased or financed by the Education Provider with its own funds, including but not limited to the funds paid by the Board to the Education Provider for License or Management Fees under this Agreement, will remain the property of the Education Provider.

7.5.     All property owned personally and/or individually by the teachers, administrative and support staff shall remain the property of the individual teachers and staff. Such property includes, but is not limited to, albums, non-Education Provider curriculum manuals, and personal



mementos and other materials or apparatus that have been personally financed or personally developed, without direct or indirect use of SABIS® Propriety Information, by teachers or staff.

**8. Amendments, Termination for Cause and Dispute Resolution.**

**8.1.** Amendments. All amendments to this Agreement shall be in writing executed by both parties.

**8.2. Termination for Cause and Dispute Resolution.**

**8.2.1.** Termination for Cause. Either party may terminate this Agreement in the event of a material breach pursuant to the provisions of 8.2.2 below.

**8.2.2.** Dispute Resolution. If either party at any time believes the other party has committed a material breach of the terms of the Charter, Charter School Law, any applicable law or regulation, or this Agreement, notice shall be given in writing to the other party as provided in Section 14 stating in detail the nature of such violation. Thereafter:

(i) The parties shall meet within ten (10) days of the notice, unless the parties are otherwise required to meet sooner in the notice, and such meeting shall be attended either in person at the school or by telephone or video conference by individuals with decision-making authority regarding the dispute, to confer as to the violation and in good faith attempt to negotiate a mutually acceptable remedy.

(ii) If, within thirty (30) days after the written notice, the parties are unable to agree to a mutually acceptable remedy, the parties agree to submit the dispute to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall take place in New Jersey and be governed by the laws of the State of New Jersey. The arbitrator shall be jointly chosen by the Board and the Education Provider. A judgment upon any award rendered may be entered in any court having jurisdiction thereof.

(iii) The arbitrator shall make a determination within fifteen (15) days of the matter being brought before the arbitrator. If the arbitrator determines that (1) one party has materially breached the Agreement and that (2) the breaching party either cannot or refuses to remedy the breach, the non-breaching party may terminate the Agreement upon thirty (30) days written notice and recover actual damages.

(iv) Each Party shall be responsible for an equal share of the cost of the arbitrator's fees and expenses. However, each Party shall be solely responsible for any expenses incurred by that Party's request for additional witnesses, representation, or services.

**8.3. School Records.** Upon expiration or termination of this Agreement, all School records, including student records, employee files, financial documents and all other records otherwise defined by State law shall be retained and thereafter maintained by the Board. The Education Provider may make and keep copies of the records to the extent permitted by law. In the event this Agreement is terminated for any reason prior to the end of an academic year, the Education Provider shall also have the right to engage an independent audit firm to complete an audit, in accordance with Generally Accepted Accounting Principles ("GAAP"), and the Board shall comply with all reasonable requests. The cost of the audit shall be shared equally by both parties to this Agreement.

9.   **Indemnification.**

**9.1.   Unless otherwise provided herein,** the Board and Education Provider agree to indemnify, save and hold harmless each other from and against any and all claims, allegations, suits, fines, penalties, expenses, costs, liabilities, and damages, whether in contract, tort or otherwise arising out of or in connection with each party's performance of its particular portion of this Agreement by reason of its acts, inaction, omissions, negligence, reckless or intentional conduct except and to the extent such losses arise out of the gross negligence or willful misconduct of the indemnified party and further provided that the party against whom any claim is made notifies the other party within a reasonable time of becoming aware of such matter, and the other party is afforded an opportunity to participate in the defense or disposition of such matter and any negotiated settlement, agreement or judgment, including engaging legal counsel of its choice. The Board and Education Provider shall at all times be solely responsible for their respective legal expenses and costs, including attorneys' fees. The right of indemnification under this section shall be in addition to and not exclusive of all other rights to which any indemnified party may be otherwise entitled by contract or by law.

**9.2.   No Waiver to Third Parties.** The foregoing provisions shall not be deemed a relinquishment or waiver of any rights or immunities of the parties to third parties.   .

10.   **Non-Discrimination.**

The Board and Education Provider shall comply with all applicable federal and state statutes, rules, regulations and orders dealing with discrimination.

11.   **Professional Fees and Expenses.**

Each party shall bear its own expenses for legal, accounting and other fees or expenses in connection with the negotiation of this Agreement.

12.   **Student and Financial Records.**

All financial records and educational records, including student records, are records of the Board and shall be kept on-site or electronically accessible on-site and be available, subject to any and all applicable laws, for authorized inspection, pursuant to local, state and federal law,

16 of 22

upon reasonable request. Such records are subject to the provisions of the Family Educational Rights and Privacy Act ("FERPA") and the applicable state Freedom of Information and/or Open Records Act. The Board designates the employees of the Education Provider or Education Provider affiliates as agents of the Board having a legitimate educational interest solely for the purpose of entitling such persons access to education records under 20 U.S.C. §1232g, the Family Educational Rights and Privacy Act ("FERPA").

13.    **Governing Law.**

This Agreement shall be governed by, subject to and construed under the laws of the State of New Jersey. Any legal actions prosecuted or instituted by any party under this Agreement shall be brought in a court of competent jurisdiction located in New Jersey and each party hereby consents to the jurisdiction and venue of any such courts for such purposes. The parties knowingly and voluntarily waive any right either of them has to a trial by jury in any proceeding which is in any way connected with this Agreement or any related agreement, or the relationship established under them.

Any notice, demand or request from one party to any other party or parties hereunder shall be deemed to have been sufficiently given or served for all purposes if, and as of the date, it is delivered by hand, overnight courier, facsimile (with confirmation) or electronic mail (with confirmation) or within three (3) business days of being sent by registered or certified mail, postage prepaid, to the parties at the following addresses:

|  |  |
|---|---|
| To: Education Provider | Manager<br>Springfield Education Management, LLC<br>6385 Beach Road<br>Eden Prairie, MN  55344 |
| Copy to: | Associate General Counsel<br>SABIS Educational Systems, Inc.<br>6385 Beach Road<br>Eden Prairie, MN  55344 |
| To:  Board | Peter Caporilli<br>29 South New York Road<br>Suite 1200<br>Galloway, NJ 08205 |
| Copy to: | Nestor H. Smith, Esq.<br>29 South New York Road<br>Suite 1200<br>Galloway, NJ 08205 |

14.    **Waiver.**

No waiver of any breach of this Agreement shall be held as a waiver of any other or subsequent breach.

15.    **Counterparts; Signature by Facsimile.**

This Agreement may be signed in counterparts, which shall together constitute the original Agreement and become effective upon Board approval. A signature delivered by facsimile shall be considered an original for purposes of this Agreement.

16.    **Assignability.**

This Agreement may not be assigned or delegated by Education Provider or by the Board without the prior written consent of the other such consent not to be unreasonably withheld. This Agreement shall be enforceable by, and shall inure to the benefit of the parties hereto and their permitted successors and assigns, and no others.

17.    **Confidentiality.**

17.1.    Each party hereby acknowledges that by virtue of its entering into and performing under this Agreement it will generate, be exposed to and have access to the Confidential Information of the other party, as such term is defined in subsection 18.2 below. Unless a party has obtained the express prior written consent of the other party, under no circumstances whatsoever, unless otherwise required by law, shall a party at any time: (i) communicate to any person or entity (other than the other party) any Confidential Information; (ii) permit access by any person or entity (other than the other party) to any Confidential Information; or (iii) use any Confidential Information for such party's own account or for the account of any person or entity (other than the other party).

17.2.    For purposes of this Agreement, "Confidential Information" shall mean (i) any financial, business, planning, software, operations, services, potential services, products, potential products, designs, technical information and/or know-how, formulas, production, purchasing, marketing, sales, personnel, customer, broker, supplier, or other information of any party; (ii) any papers, data, records, processes, methods, techniques, systems, models, samples, devices, equipment, compilations, invoices, customer lists, or documents of any party; (iii) any confidential information or trade secrets of any third party provided to any party in confidence or subject to other use or disclosure restrictions or limitations; and (iv) any other information, written, oral, or electronic, whether existing now or at some time in the future, whether pertaining to current or future developments, and whether previously accessed by any party or to be accessed during its future engagement with the other party, which pertains to such party's

affairs or interests or with whom or how such party does business. Each party acknowledges and agrees that Confidential Information does not include (i) information properly in the public domain, (ii) information in either party's possession which does not pertain to the business of the Board or of the Education Provider.

18.     **Severability.** In the event that any provision of this Agreement or the application thereof to any person or in any circumstances shall be determined to be invalid, unlawful, or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful or unenforceable, shall not be affected thereby, and each remaining provision of this Agreement shall continue to be valid and may be enforced to the fullest extent permitted by law.

19.     **Warranties and Representations.** Both the Board and the Education Provider represent that each has the authority under law to execute, deliver and perform this Agreement and to incur the obligations provided for under this Agreement, that its actions have been duly and validly authorized, and that it will adopt any and all resolutions or expenditure approvals required for the execution of this Agreement.

20.     **Preamble and Heading.** The Preamble is a general statement of purpose only and not a term of this Agreement. It does not affect in any way the meaning or interpretation of this Agreement. The headings of the sections of this Agreement are for reference only and shall not affect in any way the meaning or interpretation of this Agreement.

21.     **Entire Agreement.** This Agreement embodies the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement. Any modification of this Agreement must be made in writing, be approved by the Board and Education Provider, and be signed by a duly authorized officer, agent or attorney of the Parties.

*[SIGNATURE PAGE TO FOLLOW]*

19 of 22

The parties are signing this agreement on the date stated in the introductory clause.

Peter Caporilli, Board President
Board of Trustees of the International Academy of
Atlantic City Charter School

By: _____   01/29/2015

Mahdi Kanaou, Manager
Springfield Education Management, LLC

By _____

Primary contact for all matters not requiring formal notice under Section 13

George Saad
6385 Beach Road
Eden Prairie, MN 55344
gsaad@sabis.net
952-918-1830

20 of 22

## Appendix A

| ARTICLE I Coverage | Limits | |
|---|---|---|
| Property | | Building & Contents at 100% Replacement Cost |
| | | Special Causes of Loss Form |
| Crime (Employee Theft) | $  500,000 | Per Occurrence |
| General Liability | $1,500,000 | Per Occurrence |
| | $3,000,000 | General Aggregate |
| | $Included | Products & Completed Operations |
| | | Aggregate |
| Including Employee Benefits Liability and Sexual Misconduct Liability | | |
| Employment Practices Liability | $1,000,000 | Per Claim |
| | $3,000,000 | General Aggregate |
| Automobile Liability | $1,000,000 | Combined Single Limit |
| Including Hired and Non-owned Liability | | |
| Workers' Compensation | Statutory | (Performance State) |
| Including Alternate Employer endorsement in favor of Education Provider & SABIS® Educational Systems, Inc. | | |
| Employers' Liability | $  500,000 | Accident Limit |
| | $  500,000 | Disease – Policy Limit |
| | $  500,000 | Disease – Person Limit |
| Umbrella | $2,000 000 | Per Occurrence |
| | $2,000,000 | Aggregate |
| Professional Liability -Educators E & O | $1,000,000 | Per Claim |
| | $3,000,000 | General Aggregate |
| Directors and Officers Liability | $1,000,000 | Per Claim |
| | $3,000,000 | General Aggregate |

Policies to be purchased from a carrier licensed to do business in the State of New Jersey and carry a Best Rating of A-VII or better

1) General Liability Aggregate to apply Per Location
2) General Liability must be on an Occurrence Based Policy
3) Liability Limits may be met by using combination of underlying and umbrella policies

Certificate Description of Operations area must identify project or indicate "All Services Provided by the Named Insured"

21 of 22

The School (Named Insured), shall include as Additional Named Insured, the Education Provider and as Additional Insured SABIS® Educational Systems, Inc. and the State Charter Authorizer on ALL Liability policies on a Primary Basis with SABIS® and State Charter Sponsor policies being non-contributory.

The Liability and Workers' Compensation policies shall be endorsed to provide a Waiver of Subrogation to the Additional Insured.

A 30 day Direct Notice of Cancellation, Non-renewal or Material Change endorsement is required on all policies in favor of the Education Provider, the School, SABIS® and the State Charter Authorizer.

The only acceptable form for providing proof of insurance is the ACORD 25 S Certificate form with attached copies of additional insured, waiver of subrogation and Cancellation endorsements.

These requirements shall be mandatory unless the State Charter Authorizer includes more stringent requirements with additional coverage or higher limits.  In such case, the most stringent contract requirement shall prevail.

# EXHIBIT B

ATL-L-001531-18   06/22/2018 1:36:44 PM  Pg 38 of 73 Trans ID: LCV20181098416



**CAPEHART SCATCHARD**
ATTORNEYS AT LAW

Sanmathi Dev
856.380.6709
sdev@capehart.com
Fax: 856.235.2786

June 18, 2018

*Via Hand Delivery*

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

    Re:   SABIS/Springfield Education Management LLC – Claimant
           Board of Trustees of the International Academy of Atlantic City Charter School –
           Respondent
           Our File No.  04910-31830

Dear Sir/Madam:

        Please be advised that this office represents the Claimant, SABIS/Springfield Education Management LLC in the above-referenced matter.  Enclosed for filing please find two copies of SABIS' Demand for Arbitration.  Please return one copy, stamped as filed, in the self-addressed, stamped envelope provided.  The original Demand has been sent to the Respondent.  Also enclosed is my firm's check in the amount of $5,500 representing the filing fee.

        Should you have any questions, please do not hesitate to contact me at the office.

              Very truly yours,

              CAPEHART & SCATCHARD, P.A.

              Sanmathi Dev

SD/amc
Enc.
cc:    Board of Trustees International Academy of Atlantic City Charter School (w/enc.) *(Via UPS Overnight Delivery)*
       Dr. Peter Caporilli (w/enc.) *(Via UPS Overnight Delivery)*
       Mark G. Schwartz, Esq. (w/enc.) *(Via email)*
       Jonathan Emro, Esq. (w/enc.) *(Via email)*
       Lynn Spampinato (w/enc.) *(Via email)*
       Jose Afonso (w/enc.) *(Via email)*
       Anna Dosen (w/enc.) *(Via email)*

5927337.Docx



**AMERICAN ARBITRATION ASSOCIATION**  INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Name of Respondent: Board of Trustees of the International Academy of Atlantic City Charter School | Name of Representative (if known): Mark G. Schwartz, Esq. | | |
|---|---|---|---|
| Address: 6718 Black Horse Pike | Name of Firm (if applicable): Cooper Levenson | | |
| | Representative's Address: 1125 Atlantic Avenue | | |
| City: Egg Harbor Township  State: NJ  Zip Code: 08234 | City: Atlantic City | State: NJ | Zip Code: 08401 |
| Phone No.: 609-498-6350  Fax No.: | Phone No.: 609-572-7466 | Fax No.: 609-572-7467 | |
| Email Address: isac@sabis.net | Email Address: mschwartz@cooperlevenson.com | | |

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute: Claimant, Springfield Education Management, LLC, provides education management services in accordance with the program and philosophy of SABIS Educational Systems, Inc., to the Respondent, International Academy of Atlantic City Charter School, a public charter school in New Jersey organized under New Jersey Charter School Program Act, N.J.S.A. 18A:36A-1 et seq. In accordance with Section 8 of the Education Service Provider Agreement ("Agreement") between Claimant and Respondent, Claimant provided Respondent's counsel with written notice, dated May 17, 2018, outlining allegations of material breaches of the Agreement, as well as the School Ethics Act, Charter School Law and other laws/regulations governing public charter schools. The parties were unable to resolve the dispute amicably within the 30-day period, and thus, Claimant seeks binding arbitration pursuant to Section 8.2.2. A copy of the Agreement is attached hereto as "Exhibit A."

| Dollar Amount of Claim: $500,000 to $2,000,000 | Other Relief Sought:  Attorney's Fees   Interest   Arbitration Costs  Punitive/ Exemplary   Other: Equitable remedy to remove current Board of Trustee members and allow Claimant to manage the Charter School pursuant to the Agreement |
|---|---|
| Amount enclosed: $ 5,500        In accordance with Fee Schedule:   Standard Fee Schedule | |

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:  New Jersey school law and/or charter school law experience

| Hearing locale: Mt. Laurel, New Jersey        (check one)   Requested by Claimant   Locale provision included in the contract | |
|---|---|
| Estimated time needed for hearings overall:                3 days | Type of Business: Claimant: Provider of Management Services to Charter Schools |
| | Respondent: Charter School |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? No

| Signature (may be signed by a representative): | Date: June 18, 2018 |
|---|---|
| Name of Claimant: Springfield Education Management LLC | Name of Representative: Joseph F. Betley, Esq. & Sanmathi Dev, Esq. |
| Address (to be used in connection with this case): 6385 Beach Road | Name of Firm (if applicable): Capehart Scatchard, P.A. |

| | | | | Representative's Address: 8000 Midlantic Drive, Suite 300S | | |
| --- | --- | --- | --- | --- | --- | --- |
| City: Eden Prairie | | State: MN | Zip Code: 55344 | City: Mt. Laurel | State: NJ | Zip Code: 08054 |
| Phone No.: 970-406-0397 | | Fax No.: | | Phone No.: 856-234-6800 | Fax No.: 856-235-2786 | |
| Email Address: kspamphasto@sabla.net | | | | Email Address: jbetloy@capahart.com & zdev@capehart.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

Please visit our website at www.adr.org



### Education Service Provider Agreement

This Education Service Provider Agreement executed on this 3rd day of December, 2014, (the "Agreement") by and between The Board of Trustees of the International Academy of Atlantic City Charter School (the "Board") with offices at 29 South New York Road, Suite 1200, Galloway, NJ 08205 and Springfield Education Management LLC, a Delaware Limited Liability Company with an office at 6385 Beach Road, Eden Prairie, Minnesota 55344 (hereinafter "Education Provider").

### PREAMBLE

WHEREAS, the Board has entered into or expects to enter into a Charter School Contract, which shall include the Charter Application or Petition with the New Jersey Department of Education, to be issued effective July 1st, 2015, to operate an independent Public Charter School in accordance with the New Jersey Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 et seq, and New Jersey Administrative Code charter school regulations, N.J.A.C. 6A:11-1.1 et seq. (hereinafter "Charter School Law") and in accordance with all other applicable federal and state laws;

WHEREAS, the Education Provider is in the business of educating children in accordance with the Educational Program and philosophy of SABIS® Educational Systems, Inc., ("SABIS") and is desirous of working with the Board to implement the SABIS® Education Program and Philosophy at the School;

WHEREAS, the Board desires to have the Education Provider provide educational and other services to and on behalf of the School, in accordance with the provisions of Charter School Law, and any and all other applicable laws and regulations and upon the terms and conditions hereinafter set forth and the Education Provider desires to provide such services to the Board; and

WHEREAS, the Board and Education Provider share a common vision that diligent use of the SABIS® Educational System will help a randomly selected, diverse group of students become responsible citizens with a love of life-long learning;

### WITNESSETH

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein and for other good and lawful consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1. **Rights and Obligations of the Board.**

   1.1.   **Governance.** The Board shall be responsible for the oversight, but not the day-to-day management, of the School. The Board's oversight responsibilities shall be limited to that which is required by law or necessary to ensure the Education Provider's

compliance with the terms of this Agreement.  The Board shall comply with all of the provisions of applicable law including, but not limited to, those regulating access to equal educational opportunities, open meeting laws, New Jersey School Ethics Act, the Board's own by-laws, and freedom of information laws.  In order to allow for the Education Provider to attend Board meetings virtually, the Board agrees to make available the use of video conferencing technology at all its Board meetings.

The Board shall carry out its duties under this Agreement in such a manner as to minimize disruption to the orderly functioning and administration of the School, and the Education Provider shall have the authority in its good faith judgment to ensure such minimized disruption.  Unless otherwise agreed to in advance by the Board and the Education Provider, or in the case of an emergency, Board members shall not access the School during academic hours.  This limitation shall not apply to a Board member whose child is a student at the school.  In such a case, the particular Board member shall have the same right of access as other parents of students of the School.  The Board recognizes that frequent disruption of the educational process can be detrimental to the progress of the students and an impediment to the mutual goals of the Board and the Education Provider.  Unreasonable interference by the Board of the day-to-day management of the School will be considered a material breach of this Agreement and subject to the provisions of Section 8.2.1.

1.2.    Appointment.  The Board represents that it is authorized by law to contract with a private entity for that entity to provide educational management services.  The Board hereby appoints and engages the Education Provider for the purpose of providing managerial, administrative and educational services to the School more specifically described herein.

1.3.    Maintenance of Charter. The Board has the obligation to comply with the provisions of and to maintain the Charter Contract, granted by the New Jersey Department of Education (the "Authorizer"), including the Charter Petition or Application (the Charter Contract and Charter School Petition or Application shall hereinafter be referred to as the "Charter") for establishment of an independent Public Charter School ("the School") in accordance with all New Jersey charter school laws and regulations and in accordance with all other applicable federal and state laws.

1.4    Communication with Education Provider.

Third-Party Complaints.  If the Board receives a complaint regarding any alleged material deficiency in any aspect of the Board's or the Education Provider's operations from any person or entity, or if the Board is notified by the Authorizer or any other governmental authority that the Board or the Education Provider is or may be in material violation of Charter School Law or any other applicable law or regulation (all of the foregoing collectively referred to as "Potential Violations"), then the Board shall immediately notify the Education Provider contact listed at the end of this Agreement of the Potential Violations and provide a reasonable timeframe for the Education Provider to

investigate and report back to the Board.  Conversely, if the Education Provider is first notified of Potential Violations by any person or entity, it shall promptly notify the Board of such Potential Violations.  Upon receiving notice from any source of a Potential Violation, the Education Provider shall conduct a thorough investigation to determine whether or not the claimed violation in fact exists.  The Board shall reasonably cooperate with the Education Provider in the Education Provider's investigation of such Potential Violation.

If the Board makes a good faith determination that the Education Provider is failing to do all things necessary and reasonable to investigate, remedy, rebut or contest the alleged Potential Violation, then the Board shall provide written notice to the Education Provider of such belief, stating with particularity the reason for its finding and the Parties shall meet and attempt to resolve the dispute.  If the dispute is not resolved, the Board may, but shall not be obligated to, separately take all reasonable actions to investigate, remedy, rebut or contest the alleged Potential Violation, including but not limited to establishing direct communications with the person(s) raising the Potential Violation or retaining counsel to contest the matter or negotiate a solution.  The foregoing notwithstanding, (a) the Board shall not consent to the entry of any judgment or enter into any settlement with respect to a Potential Violation without prior written notice to the Education Provider, and (b) the Board shall seek the Education Provider's reasonable cooperation in the defense of the matter.

1.5.    **Evaluation of Education Provider.**  Education Provider shall cooperate fully with the Board in the Board's review of the progress of Education Provider towards educating the children in accordance with the Charter.  Any third-party evaluation must be performed by a mutually agreed upon evaluator.  Any evaluation of the Education Provider must not disrupt the educational process.  The first evaluation under this Agreement shall not commence prior to the completion of one full academic year.  Thereafter, evaluations shall be conducted per a mutually agreed upon schedule.

1.6.    **Student Enrollment.**  Education Provider and the Board shall work cooperatively in recruiting and admitting students to the School, subject to the Charter School Law, School Policies, and any and all other applicable federal and state laws and regulations.  Students shall be admitted to the School as determined pursuant to policies established by the Board in close cooperation and with the consent of Education Provider.  Education Provider shall be responsible for administering the School's recruitment, admissions, lottery and enrollment processes in accordance with the policies established by the Board, Charter School Law, and any and all other applicable federal and state laws and regulations.

1.7.    **Legal Status.** The School is a public charter school established by a charter issued by the New Jersey Department of Education and any extensions.  The Board is organized as a non-profit organization.

3 of 22

**1.8.    Physical Space.**  The Board shall be responsible for finding and acquiring occupancy rights in the physical spaces where the School will operate, and for ensuring the physical spaces will be ready for occupancy at least three weeks prior to the first day of school.  All costs incurred in locating facilities, including but not limited to surveying, engineering, renovation, consultant costs, and initial lease payments, shall be paid from funds allocated in the Start-Up Budget, and additional lease payments shall be part of the Operating Budget.  The Board shall delegate to the Education Provider the management of such real estate.  The Education Provider must approve in writing all decisions related to the acquisition, remodeling and maintenance of the facilities.  The Education Provider shall be responsible for determining who has access to the building, including who has keys to the building, regardless of who signs the lease or owns the property.

**1.9.    Name of the School.**  The name of the School shall be "International Academy of Atlantic City Charter School."  During the term of this Agreement, all business cards, letterhead, brochures, signs, press releases, official school correspondence, websites, including social media sites, etc., shall also contain the following words: "Member of the SABIS® School Network" pursuant to the corporate guidelines and the SABIS® Logo — the olive tree with the date 1886.  If Education Provider or another SABIS® affiliate no longer manages the School, the Board shall not be permitted to use any copyrighted or protected name or logo associated with SABIS® and shall immediately remove and return all items containing the SABIS® name and or logo.  Should the Board fail to remove and return all items containing the SABIS® name and or logo within seventy-two (72) hours of the Education Provider or other SABIS® affiliate ceasing to manage the School, the Board shall pay liquidated damages of One Thousand ($1,000.00) Dollars per day to the Education Provider.  The parties acknowledge and agree that the failure of the Board to remove and/or return all items containing the SABIS® and and/or logo within the seventy-two hours provided herein shall constitute an adequate basis for a request for, and a grant of, injunctive relief from a court of competent jurisdiction.

**1.10.    Publicity.**  The Board shall not refer to the Education Provider or any entity affiliated with the Education Provider in any advertising or other publication in connection with goods or services rendered by the Education Provider without the prior written approval of the Education Provider.

**1.11.    Governing Board Training.**  Prior to the opening of the school, as well as on a yearly basis afterwards, all Board members shall participate in formal School Governing Board training pursuant to NJSA 18A:12-33.  The cost of such training shall be a budget item.

**2.      Rights and Obligations of Education Provider.**

Consistent with the obligations of the Board under the Charter School Law, School Policies and any and all applicable federal and state laws and regulations, Education Provider shall have the following rights and obligations in connection with the operations of the School and education of the children enrolled as students in the School.

4 of 22

2.1.   **Authority and Obligation to Manage School.**

    2.1.1.   Subject to the provisions of this Agreement, Education Provider shall be responsible for the operation of the School, and Education Provider shall have the right and obligation to educate the children enrolled in the School.  These duties shall include:

(a)   Implementation of the education program and program of instruction (specifically, the SABIS® curriculum, SABIS® books and SABIS® Educational System identified in the Charter application), inclusive of all special education program requirements, consistent with NJ core curriculum standards.

(b)   Development and administration of the school's curriculum and determination of the applicable grade levels and subjects.

(c)   Selection, hiring and performance review of all personnel, including the School Director, and payroll functions on behalf of the Board, subject to the approval of the Board, such approval not to be unreasonably withheld.

(d)   Professional development for directors, instructional personnel, and other administrative staff.

(e)   Maintenance and operation of the School facilities.

(f)   Management and administration of the School, its staff, facilities and programs.

(g)   All extra-curricular programming, including but not limited to before and after school care and programs, implemented in connection with the School.

    2.1.2.   Subject to the approval of the Board, the Education Provider shall be responsible for procuring the services set forth in this Section 2.1.2 and may, and in conformance with Charter School Law, subcontract with public or private entities or with private persons, in the name of the Board and as set forth in the Budget, in furtherance of the objectives of this Agreement for:

- Food and transportation;

- Custodial services, supplies and equipment;

- Special education services;

- Construction of new buildings and/or improvements to existing building sites as Education Provider deems necessary for the implementation of its program, subject to the availability of adequate financing; and

Any other services as consented to by the Board that Education Provider deems reasonable and necessary to achieve the goals of the Board and Education Provider, including but not limited to nursing, after-school programs, security, drafting requests for proposals, and drafting grant applications.

**2.2.   Student Outcomes.** Education Provider shall provide to the Board the reports set forth in 2.3. for the Board's review and approval, and shall set student standards for performance which shall meet or exceed the minimum standards established by the Charter School Law, School Policies, and any and all other applicable federal and state laws and regulations. It shall be the responsibility of Education Provider that the students shall meet annually agreed upon standards for performance which shall provide for:

- Full compliance with the Charter School Law, the methods and philosophy as set forth in the Charter, School Policies, and any other applicable law or regulation.

- Student testing in the first month of school using a nationally recognized norm-reference test to establish a benchmark. Students will be tested again in spring, using another form of the same test, to determine their improvement during the year. A one month gain for each month of school between the fall and spring administration of the test is expected.

- Student proficiency in essential concepts per subject. Through frequent testing, as needed, as well as final exams at the end of each term, students will display proficient understanding of essential subject material as defined by the Education Provider curriculum.

**2.3.   Reporting by Education Provider.**

**2.3.1.** Education Provider shall submit an annual report to the Board before the beginning of the following academic year, reporting its progress towards attaining student outcomes. The report shall contain information regarding student achievement by grade level on a norm-reference test. Education Provider may, at its sole discretion, submit its annual report through the Director and/or the Academic Quality Control officer.

**2.3.2.** Education Provider shall provide to the Board on a quarterly basis a budget analysis showing budget versus actual comparisons in the same format as the budget. Education Provider may, at its sole discretion, submit its budget analysis through the Director and/or the Business Manager. In consultation with the Education Provider, the Board shall engage an independent audit firm to complete the annual audit and Education Provider shall comply with all reasonable requests. The cost of the audit shall be a budget item.

**2.3.3.** Education Provider shall provide full opportunity for the Board to observe the Education Provider educational processes, review curriculum, review appropriate

6 of 22

data, and meet and confer with designated Education Provider contacts, provided arrangements are made in advance with the Education Provider and provided the educational process is not disrupted. Any contact between Board Members and School staff must be made through the Education Provider.

    **2.3.4.** Education Provider shall report regularly through reports submitted by the School Director at Board meetings or at other times, as necessary. The Education Provider will delegate the representative to attend Board meetings.

    **2.4.** **Fees.** Fees may only be charged to students in accordance with applicable provisions of the Charter School Law, School Policies, and any other applicable federal or state laws or regulations. No fees may be charged or assessed to students by the Board without the prior written approval of the Education Provider.

    **2.5.** **Insurance.** The Education Service Provider undertakes to maintain insurance as listed in Appendix A to protect the interest of the School and other interested parties. Such insurance shall be taken out by the Education Service Provider at the cost and expense of the School.

    **2.6.** **Charter between the Board and Authorizer.** Neither party will act, or fail to act, in a manner that will cause the Board to be in breach of its Charter with the Authorizer.

**3.** **Budget, Funding, and Compensation to Education Provider.**

    **3.1.** **Budget.** All revenues will serve to fund the operation of the School. Education Provider, no later than May 31 of each year, or earlier if required by law, shall prepare and present to the Board a detailed recommended operating budget and capital outlay budget for the next fiscal year (the "Proposed Budget"). The Proposed Budget shall show each area of expenditure as a separate line item, including funds allocated for use by the Board for legal fees, charter renewal fees, and incidental Board administrative expenses ("Board Expenses"), and fees and payments to Education Provider. Funds allocated for Board Expenses shall not exceed $25 per student. The Board shall review the Proposed Budget with Education Provider and shall provide Education Provider with the Board's comments, in writing, within ten (10) days of receipt of the proposed budget. If the Board and Education Provider are not able to agree on a Budget before the expiration of the current fiscal year, the last approved Budget, adjusted only to reflect enrollment changes, shall remain in effect until a Budget has been agreed upon or finalized through the dispute resolution process set forth herein.

    If the parties have not reached agreement on the Budget within thirty (30) days of the submission of the Proposed Budget by Education Provider to the Board, either party may request that open issues be referred to the Executive Atlantic County Superintendent or the Department of Education on the following issues:

    **(1)** the effect on educational outcomes for the students;

(2)     the funding provided for in previous budgets and the amounts actually expended; and

(3)     the projected levels of revenue and expense for the year in issue.

**3.1.1.   Net Deficit.** Education Provider is not obligated to cover any Net Deficit (as per the audited financial statements) of the School. The Net Deficit, in its entirety, shall be the responsibility of the Board and the Board shall indemnify and hold the Education Provider harmless for any Net Deficit, including all costs and attorneys' fees.

**3.1.2.   Start-Up Costs.** The Education Provider will submit to the Board a budget for the anticipated start-up costs including a contingency of 15% in order to take into account any extraordinary additional expenses.  The Education Provider will obtain the consent of the Board in advance for unbudgeted expenses exceeding 5% of the total start-up budget.

**3.1.3.   Gaps in State Funding.**  In the event that there is a gap between Tuition Funding from the State and expenses incurred by the School due to the Tuition Funding cycle set by the State (i.e. Tuition Funding is not received on the first day of each month or the first day of each quarter), the Board is responsible for covering the gap either using the budget reserve or with a line of credit.  The line of credit shall be with a third party or, if third party funding is not available, may be with the Education Provider at the Education Provider's sole discretion.  Any line of credit provided by Education Provider will require a separate agreement between the Board and Education Provider, and interest will be charged.  Such line of credit is designed to be a short-term solution and the Board shall be required to build a reserve, or acquire a third-party line of credit, sufficient to finance funding gaps, and such reserve shall be used first to finance any funding gaps.

**3.2     Funding.** All funds received in connection with the School shall be deposited in the School's bank account.  Expenditures from the School's bank account shall be made only in accordance with the Budget (as it may be modified by agreement from time to time) and upon approval in writing by the Director of the School or the Business Manager to whom the Director may delegate this responsibility.  The School Director and one other School employee, as determined by Education Provider, shall have authority to sign checks written on the School's bank account.  A representative of Education Provider shall be appointed by Education Provider to be a back-up check signatory.

Subject to applicable laws and regulations, either party may apply for and receive funding from private sources to be used for the benefit of the School.  The Parties shall cooperate in good faith in applying for applicable funding; provided, however, that the Education Provider shall have final authority to approve or reject outside funding. Education Provider further agrees that any grants received from any federal or state agency or non-profit corporation shall be used as directed by the grantor of the grant and any unexpended funds from those sources shall not be deemed as unexpended funds, and shall not be part of the base upon which Education Provider's fees are calculated, nor in any calculation of the Year End Operating Balance. If Education Provider obtains grant funds for the School and such grant funds contain a component for

administration, Education Provider shall be entitled to that component if allowed under the terms of the grant and by law.

The Parties acknowledge that all funds allocated for the operational support of the School shall be spent in accordance with the Board-approved Operating Budget.  Significant line item deviations at the object level greater than fifteen percent (15%) of any major line item, major line items being those whose budget exceeds fifteen percent (15%) of Total Revenues, from the approved Operating Budget must be approved by the Board prior to disbursement.  Education Provider shall provide the Board with all relevant information with respect to such deviation and the Parties shall engage in good faith negotiations to resolve such extra-budgetary requests.  If the parties cannot reach an agreement, the issue shall be resolved pursuant to the procedures contained in Paragraph 8.2.2 of this Agreement.

**3.3. Compensation to Education Provider.**

3.3.1    License Fees of eight percent (8%) of total per pupil funding (as set forth in N.J.S.A. § 18A:36A-12) for the use of SABIS® pedagogical materials (including but not limited to curriculum, pacing charts, AMS exams of Math & English, Periodic exams of Math, English, Science, Spanish, Social studies, and SABIS® School Management System) provided by the Education Provider during the term of this Agreement or renewal term of this Agreement (the "License Fee"); and

3.3.2    Management Fees of six percent (6%) of total per pupil funding (as set forth in N.J.S.A. § 18A:36A-12) for services provided, including but not limited to methodologies, teaching techniques, operating policies & procedures, on-going advice, academic strategies to enhance standards, staff distributions & timetabling, and academic oversight (the "Management Fee").

3.3.3    Upon renewal of the Agreement, Education Provider reserves the right to adjust the License Fee and Management Fee subject to the approval of the Board.

3.3.4    Support Services.  Those services requested by the Board from independent contractors may be performed by Education Provider or Education Provider's parent company, SABIS® Educational Systems, Inc., provided that such services are included in the Approved Operating Budget, and further provided that Education Provider's cost to provide the services are less than the cost of an independent contractor.  These services may include but are not limited to grant writing, website development, IT training, recruitment, facilities search, and drafting of RFPs which fall outside of the Agreement. Such services will be billed at Education Provider's then-current rate and are in addition to the Management Fee and License Fee.

3.3.5    All License and Management Fees and support services fees, if any, shall be paid within *three (3)* days of receipt by the Board of any funds paid by the State to the Board. The balance of all Fees shall be paid within thirty (30) days of the final installment payment.

3.3.6.    Education Provider shall be entitled to reimbursement for expenses related to the performance of this Agreement, *which are not part of the operating budget*, only with the advance written approval of the Board based upon findings that: (a) the expense was necessary; and (b) the expense is one that should not be borne by Education Provider because it is beyond the scope of the management services for which Education Provider is being compensated by the Management Fee.

## 4.    Term and Termination.

4.1.    **Term.** This Agreement shall commence on the date this Agreement is signed and end on June 30th, 2019, and subject to renewal of the Charter and the provisions of the Charter School Law and any other applicable federal and state laws and regulations.

4.1.1.    **Option to Renew.** This Agreement will automatically renew for an additional 5 year term, subject to section 3.3.3. of this Agreement, unless either party gives notice of termination at least twelve (12) months prior to the expiration of the Term. If either party gives such notice but wishes to renegotiate the Agreement, then the parties will have a period of 6 months to renegotiate. During this period of time the Education Provider will continue managing the School under the terms of this Agreement except that any function or action related to preparing the School for the year following the end of this term will be placed on hold unless and until a new Agreement is executed. In the event that the parties wish to renegotiate the Agreement, a new Management Agreement must be signed before Education Provider will assist in the preparation of a charter renewal application.

4.2.    **Termination.**

4.2.1.    **Termination for Cause.** Either party may terminate this Agreement in the event of a material breach pursuant to the provisions of 8.2.1.

4.2.2.    **Due To Adverse Law.** If any federal, state, or local law or regulation or court decision has a materially adverse impact on the ability of either party to carry out its obligations under this Agreement, and the Parties agree as to the material adverse impact, then either party, upon written notice to the other party, may request good faith renegotiation of the Agreement; and if the Parties are unable to reach agreement on such terms, after good faith negotiations, prior to the end of the academic year, then either party may terminate the Agreement as of June 30 unless sooner termination is required by law.

**4.2.3.** **Due to Charter Termination.** In the event that the Charter is revoked or not renewed, then this Agreement shall automatically terminate as of the date of the effective date of said revocation or effective date of non-renewal.

**4.2.4.** **Due to Adverse Conditions.** If any Adverse Condition including, but not limited to, a decrease in state funding, or if a condition of the Charter makes it impossible, in the sole judgment of the Education Provider, for the Education Provider to continue managing the School, the Education Provider may terminate this Agreement upon written notice to the Board.

**4.2.5.** **Due to Dissolution of the Board.** In the event that the Board is dissolved, Education Provider may, in its sole discretion, terminate this Agreement.

**4.2.6.** Neither party shall be liable if the performance of this Agreement, in whole or in part, is prevented, delayed, hindered or otherwise made impracticable or impossible by reason of any strike, flood, riot, fire, explosion, war, act of God, sabotage, accident or any other casualty or cause not the party's fault, and which cannot be overcome by reasonable diligence and without unusual expense.

**4.2.7.** The Board acknowledges that this Agreement and all other agreements entered into between Education Provider, or any of its affiliates, subsidiaries, successors and/or assigns are deemed to be mutually dependent upon each other and a breach of any one agreement by the Board, may at the option of Education Provider, or any of its affiliates, subsidiaries, successors and/or assigns, be deemed a breach of any and all other agreements between the parties.

**4.2.8.** **No Disparagement.** In the event of any termination of this Agreement, the Parties agree that neither party, nor any of its members, affiliates, and/or associates will, directly or indirectly, in any capacity or manner, make, express, transmit, speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory or critical of, or negative toward, the other or any it's respective directors, officers, affiliates, subsidiaries, employees, agents or representatives.

Notwithstanding the foregoing, nothing in Section 4.2.8 or elsewhere in this Agreement shall prohibit either party from making any statement or disclosure required by local, state or federal law or ordinance.

**5.** **Employees.**

**5.1.** **Teachers and Staff.** The Board shall be the employer of all personnel but shall delegate all personnel functions to the Education Provider, subject to the approval of the Board and such

approval not to be unreasonably withheld. The Education Provider shall provide the following personnel functions: 1) selecting, hiring, training, managing, reviewing and terminating all staff associated with the School, including without limitation its teachers and all administrative and support staff, establishing personnel policies and procedures, and determining teacher and staff compensation; 2) determining the number of teachers and the number of support staff required for the operation of the School pursuant to the Charter; and 3) selecting and hiring such teachers, qualified in the grade levels and subjects required, and support staff as are needed to carry out the SABIS® Educational System of the School. Any employment decision that impacts the tenure of any staff member shall require approval of the Board, such approval not to be unreasonably withheld.

All classroom teachers and professional support staff shall hold appropriate New Jersey certification pursuant to N.J.S.A. 18A:36A-14. Such teachers and support staff may, at the discretion of the Education Provider, work at the School on a full or part time basis. Each teacher hired or retained by the Education Provider shall hold a valid teaching certificate issued by the state board of education, if required by law, and all teachers and staff shall have undergone a criminal background check and an unprofessional conduct check, as required by Charter School Law and other applicable state and federal laws.

**5.2    School Director.** The Board shall be the employer of the School Director but shall delegate all personnel functions relating to the employment of the School Director to the Education Provider including selecting, hiring, training, managing, reviewing, determining compensation and terminating the School Director. The Education Provider will have the authority and responsibility of holding the School Director accountable for the success of the School. The School Director shall report to the Education Provider and not to the Board. Any employment decision that impacts the tenure of the School Director shall require approval of the Board, such approval not to be unreasonably withheld.

**5.3.    Training.** The Education Provider shall provide training in its methods, curriculum, and the SABIS® Educational System to all personnel on a regular and continuous basis, or as deemed necessary by the Education Provider. All personnel shall receive such training as the Education Provider determines as reasonable and necessary under the circumstances, or as required by Charter School Law. Training shall occur on-site or at locations to be designated by Education Provider, at Education Provider's discretion. Expenses for training and seminars, including travel and lodging, related to the School shall be a budget item.

**6.    Proprietary Information,**

**6.1.    Education Provider's Prior Rights.** The Board agrees that Education Provider has the licensing right for (a) all trademarks, copyrights and other proprietary rights developed prior to the effective date of this Agreement, and hereinafter subsisting or created in its instructional materials, training materials, methods and other materials developed by Education Provider, its affiliates (including but not limited to SABIS® Educational Systems, Inc.) their employees, agents or subcontractors (to the extent such individuals are legally or contractually obligated to assign or have assigned such rights to Education Provider or to SABIS®

Educational Systems, Inc.).; and (b) such other similar instructional materials, training materials, methods and other materials that may be developed at Education Provider sites or sites of Education Provider affiliated entities, which is protected by law ("SABIS® Proprietary Information"). During the term of this Agreement, Education Provider may identify and disclose to the School SABIS Proprietary Information including that which is currently in existence as well as that which may be created in the future.

6.2.    License to Board.  Execution of this Agreement shall give rise to a revocable, limited, non-exclusive, non-transferable license, for the use of SABIS Proprietary Information to the Board for the purpose of operating the School's SABIS® Educational System, and Education Provider shall be paid a fee therefore as provided in Section 3.3.1.  The Board shall be separately charged for books and consumable materials provided by the Education Provider to the School, even if such books and consumable materials contain SABIS® Proprietary Information.  Except to the extent necessary for implementation of this Agreement, the Board shall not disclose, publish, copy, transmit, or utilize SABIS® Proprietary Information during the term of this Agreement or at any time after its expiration without the prior written approval of Education Provider.

6.3.    Jointly Developed Proprietary Information ("Derivative Works").  Derivative Works may only be created with written permission of Education Provider, including any and all curriculum or other educational materials which the Board may wish to develop using part or all of SABIS® Proprietary Information.  Any such Derivative Works shall be considered SABIS® proprietary information and treated in accordance with Paragraph 6.1 of this Agreement.  Education Provider will not claim as proprietary any curriculum or other educational materials developed and paid for by the Board, provided that such materials are developed wholly independently and without the use, directly or indirectly, of any SABIS® Proprietary Information.

6.4.    Education Provider Warranty and Indemnification.  Education Provider warrants that it has all necessary rights to license the SABIS® Proprietary Information to the Board.  Education Provider shall defend at its own cost any claim or action against the Board or the School for infringement of any patent, copyright, trade secret or other proprietary interest of any third party based upon any materials furnished or licensed hereunder or upon the Board's or the School's use of such furnished or licensed materials.  Education Provider further agrees to indemnify and hold the Board and the School harmless from any and all liabilities, losses, damages, costs and expenses associated with any such claim incurred by the Board or the School including reasonable attorney's fees.  If any SABIS Proprietary Information and/or other materials furnished hereunder is/are involved in such claim or action are held to constitute infringement and the use thereof is enjoined, Education Provider shall at its own expense: (1) procure for the Board and the School the right to continue using such materials; (2) modify the materials to become non-infringing but functionally equivalent; (3) replace such materials with equally suitable and functionally equivalent non-infringing materials; or (4) grant the Board an appropriate refund.

7.    **Property Ownership.**

7.1.    With respect to property acquisitions, the Education Provider has an obligation to act in the best interest of the School.  All property purchased through the operating Budget with funds the Board may receive pursuant to Charter School Law, other than funds which accrue to Education Provider (including, but not limited to, the fees referenced in Paragraph 3, any reimbursed Education Provider expenses, lease payments, and any funds advanced under a Line of Credit, if applicable), as well as funds the Board may acquire through government or private grants or donations, shall remain the property of the Board.

7.2.    All contracts, whether with public or private entities, shall be entered into whenever possible in the name of the Board or School, as appropriate. Education Provider shall not be required to directly enter into any contract.  Further, Education Provider shall not be required to guarantee any contract entered into on behalf of or by the School or the Board.  Any contract or lease which Education Provider enters into for the use of property, whether real or personal, for the School shall include, if possible, a provision that the contract may be assigned to the Board. Upon termination of this Agreement, and in the event of subsequent dissolution of Education Provider, all property which Education Provider might lease, borrow or contract for use, shall be promptly returned to those organizations or individuals from which Education Provider has leased, borrowed, or contracted for the materials unless the Board votes to assume said contract or lease, and then Education Provider shall assign said contract(s) or lease(s) to the Board, if possible. All contracts shall, when possible, also include a provision terminating the contract upon termination of this Agreement at the option of either the Board or Education Provider, but in no event shall the contract exceed the term of the charter, unless prior approval is received from the Board, however, either party may elect to continue and assume the obligations of the contract.

7.3.    All acquisitions that, due to the Board's inability to purchase or finance, are purchased by the Education Provider with non-School funds including, but not limited to, instructional materials, equipment, supplies, furniture, computers and other technology, shall be owned by and remain the property of the Education Provider.  Any property purchased with funds advanced to the Board by the Education Provider under a Line of Credit note shall be considered collateral until the note is repaid.  The Board shall execute any documents required by the Education Provider to secure the collateral, including but not limited to any security instruments including but not limited to a note, security agreement and UCC statement.

7.4.    Upon termination for any reason, all property which has been purchased or financed by the Education Provider with its own funds, including but not limited to the funds paid by the Board to the Education Provider for License or Management Fees under this Agreement, will remain the property of the Education Provider.

7.5.    All property owned personally and/or individually by the teachers, administrative and support staff shall remain the property of the individual teachers and staff.  Such property includes, but is not limited to, albums, non-Education Provider curriculum manuals, and personal

mementos and other materials or apparatus that have been personally financed or personally developed, without direct or indirect use of SABIS® Propriety Information, by teachers or staff.

8.    Amendments, Termination for Cause and Dispute Resolution.

   8.1.  Amendments.  All amendments to this Agreement shall be in writing executed by both parties.

   8.2.  Termination for Cause and Dispute Resolution.

      8.2.1.  Termination for Cause.  Either party may terminate this Agreement in the event of a material breach pursuant to the provisions of 8.2.2 below.

      8.2.2.  Dispute Resolution.  If either party at any time believes the other party has committed a material breach of the terms of the Charter, Charter School Law, any applicable law or regulation, or this Agreement, notice shall be given in writing to the other party as provided in Section 14 stating in detail the nature of such violation. Thereafter:

         (i)     The parties shall meet within ten (10) days of the notice, unless the parties are otherwise required to meet sooner in the notice, and such meeting shall be attended either in person at the school or by telephone or video conference by individuals with decision-making authority regarding the dispute, to confer as to the violation and in good faith attempt to negotiate a mutually acceptable remedy.

         (ii)    If, within thirty (30) days after the written notice, the parties are unable to agree to a mutually acceptable remedy, the parties agree to submit the dispute to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  The arbitration shall take place in New Jersey and be governed by the laws of the State of New Jersey.  The arbitrator shall be jointly chosen by the Board and the Education Provider.  A judgment upon any award rendered may be entered in any court having jurisdiction thereof.

         (iii)   The arbitrator shall make a determination within fifteen (15) days of the matter being brought before the arbitrator.  If the arbitrator determines that (1) one party has materially breached the Agreement and that (2) the breaching party either cannot or refuses to remedy the breach, the non-breaching party may terminate the Agreement upon thirty (30) days written notice and recover actual damages.

         (iv)    Each Party shall be responsible for an equal share of the cost of the arbitrator's fees and expenses.  However, each Party shall be solely responsible for any expenses incurred by that Party's request for additional witnesses, representation, or services.

15 of 22

**8.3.  School Records.** Upon expiration or termination of this Agreement, all School records, including student records, employee files, financial documents and all other records otherwise defined by State law shall be retained and thereafter maintained by the Board. The Education Provider may make and keep copies of the records to the extent permitted by law. In the event this Agreement is terminated for any reason prior to the end of an academic year, the Education Provider shall also have the right to engage an independent audit firm to complete an audit, in accordance with Generally Accepted Accounting Principles ("GAAP"), and the Board shall comply with all reasonable requests.  The cost of the audit shall be shared equally by both parties to this Agreement.

**9.  Indemnification.**

**9.1.  Unless** otherwise provided herein, the Board and Education Provider agree to indemnify, save and hold harmless each other from and against any and all claims, allegations, suits, fines, penalties, expenses, costs, liabilities, and damages, whether in contract, tort or otherwise arising out of or in connection with each party's performance of its particular portion of this Agreement by reason of its acts, inaction, omissions, negligence, reckless or intentional conduct except and to the extent such losses arise out of the gross negligence or willful misconduct of the indemnified party and further provided that the party against whom any claim is made notifies the other party within a reasonable time of becoming aware of such matter, and the other party is afforded an opportunity to participate in the defense or disposition of such matter and any negotiated settlement, agreement or judgment, including engaging legal counsel of its choice.  The Board and Education Provider shall at all times be solely responsible for their respective legal expenses and costs, including attorneys' fees.  The right of indemnification under this section shall be in addition to and not exclusive of all other rights to which any indemnified party may be otherwise entitled by contract or by law.

**9.2.  No Waiver to Third Parties.** The foregoing provisions shall not be deemed a relinquishment or waiver of any rights or immunities of the parties to third parties.

**10.  Non-Discrimination.**

The Board and Education Provider shall comply with all applicable federal and state statutes, rules, regulations and orders dealing with discrimination.

**11.  Professional Fees and Expenses.**

Each party shall bear its own expenses for legal, accounting and other fees or expenses in connection with the negotiation of this Agreement.

**12.  Student and Financial Records.**

All financial records and educational records, including student records, are records of the Board and shall be kept on-site or electronically accessible on-site and be available, subject to any and all applicable laws, for authorized inspection, pursuant to local, state and federal law,

upon reasonable request. Such records are subject to the provisions of the Family Educational Rights and Privacy Act ("FERPA") and the applicable state Freedom of Information and/or Open Records Act. The Board designates the employees of the Education Provider or Education Provider affiliates as agents of the Board having a legitimate educational interest solely for the purpose of entitling such persons access to education records under 20 U.S.C. §1232g, the Family Educational Rights and Privacy Act ("FERPA").

13.    Governing Law.

This Agreement shall be governed by, subject to and construed under the laws of the State of New Jersey. Any legal actions prosecuted or instituted by any party under this Agreement shall be brought in a court of competent jurisdiction located in New Jersey and each party hereby consents to the jurisdiction and venue of any such courts for such purposes. The parties knowingly and voluntarily waive any right either of them has to a trial by jury in any proceeding which is in any way connected with this Agreement or any related agreement, or the relationship established under them.

Any notice, demand or request from one party to any other party or parties hereunder shall be deemed to have been sufficiently given or served for all purposes if, and as of the date, it is delivered by hand, overnight courier, facsimile (with confirmation) or electronic mail (with confirmation) or within three (3) business days of being sent by registered or certified mail, postage prepaid, to the parties at the following addresses:

|  |  |
|---|---|
| To:  Education Provider | Manager<br>Springfield Education Management, LLC<br>6385 Beach Road<br>Eden Prairie, MN  55344 |
| Copy to: | Associate General Counsel<br>SABIS Educational Systems, Inc.<br>6385 Beach Road<br>Eden Prairie, MN  55344 |
| To:  Board | Peter Caporilli<br>29 South New York Road<br>Suite 1200<br>Galloway, NJ 08205 |
| Copy to: | Nestor H. Smith, Esq.<br>29 South New York Road<br>Suite 1200<br>Galloway, NJ 08205 |

14.   **Waiver.**

No waiver of any breach of this Agreement shall be held as a waiver of any other or subsequent breach.

15.   **Counterparts; Signature by Facsimile.**

This Agreement may be signed in counterparts, which shall together constitute the original Agreement and become effective upon Board approval.  A signature delivered by facsimile shall be considered an original for purposes of this Agreement.

16.   **Assignability.**

This Agreement may not be assigned or delegated by Education Provider or by the Board without the prior written consent of the other such consent not to be unreasonably withheld.  This Agreement shall be enforceable by, and shall inure to the benefit of the parties hereto and their permitted successors and assigns, and no others.

17.   **Confidentiality.**

17.1.   Each party hereby acknowledges that by virtue of its entering into and performing under this Agreement it will generate, be exposed to and have access to the Confidential Information of the other party, as such term is defined in subsection 18.2 below. Unless a party has obtained the express prior written consent of the other party, under no circumstances whatsoever, unless otherwise required by law, shall a party at any time: (i) communicate to any person or entity (other than the other party) any Confidential Information; (ii) permit access by any person or entity (other than the other party) to any Confidential Information; or (iii) use any Confidential Information for such party's own account or for the account of any person or entity (other than the other Party).

17.2.   For purposes of this Agreement, "Confidential Information" shall mean (i) any financial, business, planning, software, operations, services, potential services, products, potential products, designs, technical information and/or know-how, formulas, production, purchasing, marketing, sales, personnel, customer, broker, supplier, or other information of any party; (ii) any papers, data, records, processes, methods, techniques, systems, models, samples, devices, equipment, compilations, invoices, customer lists, or documents of any party; (iii) any confidential information or trade secrets of any third party provided to any party in confidence or subject to other use or disclosure restrictions or limitations; and (iv) any other information, written, oral, or electronic, whether existing now or at some time in the future, whether pertaining to current or future developments, and whether previously accessed by any party or to be accessed during its future engagement with the other party, which pertains to such party's

affairs or interests or with whom or how such party does business. Each party acknowledges and agrees that Confidential Information does not include (i) information properly in the public domain, (ii) information in either party's possession which does not pertain to the business of the Board or of the Education Provider.

18.     **Severability.** In the event that any provision of this Agreement or the application thereof to any person or in any circumstances shall be determined to be invalid, unlawful, or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful or unenforceable, shall not be affected thereby, and each remaining provision of this Agreement shall continue to be valid and may be enforced to the fullest extent permitted by law.

19.     **Warranties and Representations.** Both the Board and the Education Provider represent that each has the authority under law to execute, deliver and perform this Agreement and to incur the obligations provided for under this Agreement, that its actions have been duly and validly authorized, and that it will adopt any and all resolutions or expenditure approvals required for the execution of this Agreement.

20.     **Preamble and Heading.** The Preamble is a general statement of purpose only and not a term of this Agreement. It does not affect in any way the meaning or interpretation of this Agreement. The headings of the sections of this Agreement are for reference only and shall not affect in any way the meaning or interpretation of this Agreement.

21.     **Entire Agreement.** This Agreement embodies the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement. Any modification of this Agreement must be made in writing, be approved by the Board and Education Provider, and be signed by a duly authorized officer, agent or attorney of the Parties.

*[SIGNATURE PAGE TO FOLLOW]*

19 of 22

The parties are signing this agreement on the date stated in the introductory clause.

Peter Caporilli, Board President
Board of Trustees of the International Academy of
Atlantic City Charter School

By _____ 01/29/2015

Mahdi Kansou, Manager
Springfield Education Management, LLC

By _____

Primary contact for all matters not requiring formal notice under Section 13

George Saad
6385 Beach Road
Eden Prairie, MN 55344
gsaad@sabis.net
952-918-1850

20 of 22

## Appendix A

| ARTICLE I Coverage | Limits | |
|---|---|---|
| Property | Building & Contents at 100% Replacement Cost | |
| | Special Causes of Loss Form | |
| Crime (Employee Theft) | $ 500,000 | Per Occurrence |
| General Liability | $1,500,000 | Per Occurrence |
| | $3,000,000 | General Aggregate |
| | $Included | Products & Completed Operations |
| | | Aggregate |
| | Including Employee Benefits Liability and Sexual Misconduct Liability | |
| Employment Practices Liability | $1,000,000 | Per Claim |
| | $3,000,000 | General Aggregate |
| Automobile Liability | $1,000,000 | Combined Single Limit |
| | Including Hired and Non-owned Liability | |
| Workers' Compensation | Statutory | (Performance State) |
| | Including Alternate Employer endorsement in favor of Education Provider & SABIS® Educational Systems, Inc. | |
| Employers' Liability | $ 500,000 | Accident Limit |
| | $ 500,000 | Disease – Policy Limit |
| | $ 500,000 | Disease – Person Limit |
| Umbrella | $2,000,000 | Per Occurrence |
| | $2,000,000 | Aggregate |
| Professional Liability -Educators E & O | $1,000,000 | Per Claim |
| | $3,000,000 | General Aggregate |
| Directors and Officers Liability | $1,000,000 | Per Claim |
| | $3,000,000 | General Aggregate |

Policies to be purchased from a carrier licensed to do business in the State of New Jersey and carry a Best Rating of A-VII or better

1)   General Liability Aggregate to apply Per Location
2)   General Liability must be on an Occurrence Based Policy
3)   Liability Limits may be met by using combination of underlying and umbrella policies

Certificate Description of Operations area must identify project or indicate "All Services Provided by the Named Insured"

21 of 22

The School (Named Insured), shall include as Additional Named Insured, the Education Provider and as Additional Insured SABIS® Educational Systems, Inc. and the State Charter Authorizer on ALL Liability policies on a Primary Basis with SABIS® and State Charter Sponsor policies being non-contributory.

The Liability and Workers' Compensation policies shall be endorsed to provide a Waiver of Subrogation to the Additional Insured.

A 30 day Direct Notice of Cancellation, Non-renewal or Material Change endorsement is required on all policies in favor of the Education Provider, the School, SABIS® and the State Charter Authorizer.

The only acceptable form for providing proof of Insurance is the ACORD 25 S Certificate form with attached copies of additional insured, waiver of subrogation and Cancellation endorsements.

These requirements shall be mandatory unless the State Charter Authorizer includes more stringent requirements with additional coverage or higher limits. In such case, the most stringent contract requirement shall prevail.

22 of 22

# EXHIBIT C



Sanmathi Dev
856.380.8709
sdev@capehart.com
Fax: 856.235.2786

June 11, 2018

*Via Facsimile (609-633-0279) and Regular Mail*

Kathryn A. Whalen, Director
School Ethics Commission
New Jersey Department of Education
P.O. Box 500
Trenton, NJ 08625-0500

Re:  Anna Dosen and Jose Afonso v. Peter Caporilli
     Our File No. 04910-31830

Dear Director Whalen:

This firm represents the Complainants, Anna Dosen and Jose Afonso, in the above-referenced matter.

Enclosed for filing with the Commission please find an original and two copies of the Complainants' Complaint. A self-addressed, stamped envelope is also enclosed for your convenience in returning a copy of the Complaint marked as filed.

Should you have any questions, please do not hesitate to contact me at the office.

Very truly yours,

CAPEHART & SCATCHARD, P.A.

Sanmathi Dev

SD/amc
Enc.
cc:  Dr. Peter Caporilli (via email and regular mail w/enc.)
     Anna Dosen (via email w/enc.)
     Jose Afonso (via email w/enc.)

5912050.Docx

Sanmathi Dev, Esq.
CAPEHART & SCATCHARD, P.A.
8000 Midlantic Drive, Suite 300S
Mount Laurel, N.J. 08054
(856) 380-6709
Attorneys for Complainants, Anna Dosen and Jose Afonso

| ANNA DOSEN AND JOSE AFONSO, | : | STATE OF NEW JERSEY |
| | : | SCHOOL ETHICS COMMISSION |
| Complainants, | : | |
| | : | DOCKET NO. _____ |
| vs. | : | |
| | : | |
| PETER CAPORILLI, | : | **COMPLAINT** |
| | : | |
| Respondent. | : | |

Anna Dosen and Jose Afonso, both with an address of 6385 Beach Road, Eden Prairie,

Minnesota 55344, request the School Ethics Commission to consider a complaint against Dr.

Peter Caporilli whose home address is 6 Driftwood Court, Galloway, New Jersey 08205, in

accordance with the authority of the School Ethics Commission to entertain such complaints

under N.J.S.A. 18A:12-21 et seq.:

<u>Count One</u>

1.     At all times relevant, Peter Caporilli is a member of the International Academy of

Atlantic City Charter School Board of Trustees ("IAAC Board") located at 6718 Black Horse

Pike, Egg Harbor Township, New Jersey 08234.  Dr. Caporilli has been a member of the IAAC

Board since its inception.

2.     Dr. Caporilli has been the President of the IAAC Board and currently continues to

serve in this capacity.

3.     As a member of the IAAC Board, Dr. Caporilli is subject to the New Jersey

School Ethics Act, N.J.S.A. 18A:12-21 et seq.

4. Anna Dosen and Jose Afonso are employed by SABIS Educational Systems, Inc. /Springfield Education Management LLC (collectively "SABIS"). SABIS is an educational service provider.

5. Since January 2015, SABIS has provided managerial, administrative, and educational services to the IAAC Board and its staff pursuant to a contract between SABIS and the IAAC Board.

6. Specifically, SABIS is responsible for the selection, hiring, and performance review of all personnel. Per the contract with SABIS, the Board delegates all personnel functions relating to the employment of the School Director to SABIS including the selection, hiring, training, managing, reviewing, determining, compensation and terminating the School Director. In addition, SABIS is responsible for the management and administration of the school, its staff, facilities and programs.

7. Dr. Caporilli routinely micromanages and asserts himself in the daily operations of the International Academy of Atlantic City Charter School ("School").

8. Most recently, beginning on or about January 2018, Dr. Caporilli unilaterally discussed, negotiated, and determined various terms of employment of the School Director, Dr. Natakie Chestnut. For example, Dr. Caporilli met with Dr. Chestnut on March 2, 2018 to discuss her employment and performance.

9. On April 16, 2018, the Board placed Dr. Chestnut on administrative leave pending an investigation. On or about this time, Dr. Caporilli unilaterally pre-arranged, negotiated, selected and/or presented a candidate for an Interim School Director. In addition, on or about this time, Dr. Caporilli unilaterally pre-arranged, negotiated, selected and/or presented a

candidate, who is a close, personal friend of Dr. Caporilli, to conduct an investigation regarding Dr. Chestnut.

10.     On May 14, 2018, Dr. Caporilli held a meeting with all School staff announcing that Tony Degatano is the new Interim Director.  Dr. Caporilli directed Mr. Degatano to begin working on evaluations of staff members prior to any Board action to approve his employment. On May 16, 2018, Mr. Degatano notified all staff that he would be out the week of May 21, 2018 and that Carol Spina would be substituting for him as Interim School Director.

11.     On May 14, 2018, Dr. Caporilli announced to all School staff that the Board is ending its contract with SABIS for the 2018-2019 school year without Board approval.  The Human Resource Generalist at the School notified all staff that the Board "has made a decision to move forward into next year without SABIS."  However, no Board action was taken.

12.     At all times relevant, Dr. Caporilli has directed the Human Resources Generalist to notify him of every instance in which SABIS requests information from the school.

13.     At all times relevant, Dr. Caporilli refers to, considers, and/or utilizes the IAAC Board room as his personal office.  For example, in March 2018, Dr. Caporilli was upset with Dr. Chestnut for using the IAAC Board room when he was on the premises.

14.     Dr. Caporilli conduct violates N.J.S.A. 18A:12-24.1(c), (d), (e), (f) and (h) of the School Ethics Act.

<u>Count Two</u>

15.     Complainants repeat each and every paragraph above as if set forth at length herein.

16.     At all times relevant, in addition to serving as President of the IAAC Board, Dr. Caporilli has simultaneously served as President of the Atlantic City Ballet.

17.    At the August 9, 2017 IAAC Board meeting, Dr. Caporilli voted in favor of approving the bill list, which included payment of $1,430.00 to the Atlantic City Ballet.

18.    Complainants only recently discovered Dr. Caporilli's action on or about April 24, 2018 due to the IAAC Board's egregious delay in providing board meeting agendas and minutes. Specifically, SABIS has repeatedly requested the IAAC Board to provide meeting agendas and minutes in a timely fashion, yet the IAAC Board has refused to do so.

19.    Dr. Caporilli's conduct created a direct or indirect benefit to himself and an organization with which he serves as President.

20.    As a result, Dr. Caporilli's conducted violates N.J.S.A. 18A:12-24(b) and (c) of the School Ethics Act.

WHEREFORE, Anna Dosen and Jose Afonso request that the School Ethics Commission find and determine that Dr. Caporilli has violated the School Ethics Act and that he be subject to such penalty as provided by the Act.

CAPEHART & SCATCHARD, P.A.
Attorneys for Complainants, Anna Dosen
and Jose Afonso

Dated: June 11, 2018

By: _____
           Sanmathi Dev, Esq.

4 of 6

## CERTIFICATION UNDER OATH

Anna Dosen and Jose Afonso, both of full age, being duly sworn upon his or her oath according to law deposes and says:

1. I am the complainant in this matter.

2. I have read the complaint and aver that the facts contained therein are true to the best of my knowledge and belief and I am aware that the statute that created the School Ethics Commission authorizes the School Ethics Commission to impose penalties for filing a frivolous complaint. N.J.S.A. 18A:12-29(e). I am aware that if the respondent alleges that the complaint is frivolous, I shall have 20 days from receipt of the answer to respond to the allegation.

3. The subject matter of this complaint is not pending in any court of law or administrative agency of this State. I will advise the School Ethics Commission if I subsequently become aware that it is pending elsewhere.

_____
Anna Dosen

Date: June 11, 2018

Sworn and subscribed to before me this 11th day of June, 2018.

_____     JONATHAN RYAN EMRO
                                     NOTARY PUBLIC - MINNESOTA
                                     My Commission Expires Jan. 31, 2019

_____
Jose Afonso

Date:_____

Sworn and subscribed to before me this _____ day of _____, _____.

5 of 6

## CERTIFICATION UNDER OATH

Anna Dosen and Jose Afonso, both of full age, being duly sworn upon his or her oath according to law deposes and says:

1. I am the complainant in this matter.

2. I have read the complaint and aver that the facts contained therein are true to the best of my knowledge and belief and I am aware that the statute that created the School Ethics Commission authorizes the School Ethics Commission to impose penalties for filing a frivolous complaint. N.J.S.A. 18A:12-29(e). I am aware that if the respondent alleges that the complaint is frivolous, I shall have 20 days from receipt of the answer to respond to the allegation.

3. The subject matter of this complaint is not pending in any court of law or administrative agency of this State. I will advise the School Ethics Commission if I subsequently become aware that it is pending elsewhere.

_____
Anna Dosen

Date:_____

Sworn and subscribed to before me this _____ day of _____, _____.

_____
Jose Afonso

Date:_____06-11-18_____

Sworn and subscribed to before me this 11th day of June, 2018.

State of New Hampshire
County of Hillsborough
Notary Public Karissann Taylor
My Commission Expires: Aug 5 2020

KARISSAANN TAYLOR
Notary Public, New Hampshire
My Commission Expires Aug 5, 2020

State of New Hampshire

County of Hillsborough

This instrument was acknowledged before me on the 11th of June, 2018, by Jose Afonso.

Notary Public

My commission expires: Aug 5 2020

KARRISSAANN TAYLOR
Notary Public, New Hampshire
My Commission Expires Aug 5, 2020

X

## CERTIFICATE OF SERVICE

I hereby certify that on the _11th_ day of June, 2018, I caused to be delivered via email

and regular mail a copy of the foregoing Complaint directed to the following:

> Dr. Peter Anthony Caporilli
> 6 Driftwood Court
> Galloway, NJ  08205
> propeter@comcast.net
> peter@tidewaterworkshop.com

I hereby certify that the foregoing statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

_A. Dev_
_____
Sanmathi Dev, Esq.